**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CITY OF JOLIET, an Illinois Municipal | ) | |
| Corporation, | ) | 05 C 6746 |
|       Plaintiff, | ) | |
| | ) | |
|     v. | ) | |
| | ) | |
| MID-CITY NATIONAL BANK OF | ) | |
| CHICAGO, et al., | ) | Hon. Charles R. Norgle |
| | ) | |
|       Defendants. | ) | |

**OPINION AND ORDER**

Before the court is Defendant New West and New Bluff's ("New West") Motion to Establish 2012 or Thereafter as the Relevant Date for Just Compensation Valuation, and Motion to Admit Evidence of Joliet's Failure to Comply with the 2007 Equity in Eminent Domain Act. Also before the court is Plaintiff City of Joliet's ("Joliet" or the "City") Motion to Exclude Post-2005 Evidence. For the following reasons, New West's motions are granted and Joliet's motion is denied.

**I. DISCUSSION**

**A. New West's Motion to Establish 2012 or Thereafter as the Relevant Date for Just Compensation Valuation**

New West argues that, under the Illinois Supreme Court's decision in Forest Preserve District of DuPage County v. First National Bank of Franklin Park, 961 N.E.2d 775 (Ill. 2011), just compensation should be determined as of 2012 or later. New West is correct. Prior to Forest Preserve, "the date of filing the complaint was to be considered the valuation date for purposes of determining just compensation." Id. at 778 (citing 735 ILCS 5/7-121 (1998)). Relying on Kirby Forest Industries, Inc. v. United States, 467

U.S. 1 (1984), the Illinois Supreme Court struck down the "date of filing" rule. In its place, the court adopted a "date of taking rule," holding that "a taking in Illinois for the purposes of applying Kirby occurs on the date that the government (1) deposits the amount of compensation that has been ascertained and awarded, *and* (2) acquires title and the right to possess the property." Id. at 786.

Here, the earliest possible year in which Joliet could take possession of and pay for the property, commonly known as Evergreen Terrace I and Evergreen Terrace II ("Evergreen Terrace" or "Subject Property"), is 2012. Thus, in determining just compensation under Forest Preserve, Evergreen Terrace must be valued as of 2012 or later, depending on when, if at all, a taking occurs. As such, for purposes of determining just compensation, a valuation of Evergreen Terrace as of any year before 2012 is irrelevant and inadmissible.

The court notes that, while the City originally opposed this motion, see Pl.'s Resp. on the Merits to Defs.' Mot. in Limine to Establish Valuation Date, it appears to have conceded the point in its opening statement. Joliet's attorney explained:

> MR. FIGLIULO. If you are attacking a legislative act as being arbitrary, capricious or illegal, in my opinion, it needs to be judged based on what were the circumstances as they existed at the time of that legislative act. And if you are attacking it you have got to prove that that decision, that action, was an abuse of discretion.
> THE COURT: And that point would also cover the value of the taking at the time the ordinance was passed?
> MR. FIGLIULO: I think that relevant –
> THE COURT: The fair cash market value.
> MR. FIGLIULO: Oh, no. No, no. I don't think so. I used to think so, but the Illinois Supreme Court has suggested that valuation is different. And that if there – and it usually is going to still be the date of the taking. But the – if there is a big gap in time, and that that – it's not fair to the owner to have just compensation determined based on things several years ago, then you can take a valuation date that's more current at the time that just

2

compensation is determined. That's a different concept. That's really different.

Tr. of Proceedings, Sept. 27, 2012, at 60:8-61:2. Accordingly, New West's Motion to Establish 2012 or Thereafter as the Relevant Date for Just Compensation Valuation is granted.

## B. New West's Motion to Admit Evidence of Joliet's Failure to Comply with the 2007 Equity in Eminent Domain Act

The parties dispute which Illinois eminent domain statute applies to this case. Joliet argues that the now-repealed law, 735 ILCS 5/7-101 *et seq.*, should apply, whereas New West contends that the current law, the 2007 Equity in Eminent Domain Act, 735 ILCS 30/1-1-1 *et seq.* ("2007 Act") should apply.

Joliet filed the original condemnation complaint in the Circuit Court of Will County on October 7, 2005, and the case was removed to this court on November 29, 2005. On March 9, 2012, Joliet filed its Second Amended Complaint, which New West answered on March 30, 2012. The Second Amended Complaint includes new allegations about Defendant United States Department of Housing and Urban Development's ("HUD") interest in Evergreen Terrace. Specifically, it alleges that, in October 2005, HUD did not hold a mortgage to Evergreen Terrace, but rather was an insurer of the mortgage and a party to two regulatory agreements that were incorporated into the mortgage. Second Am. Compl. ¶ 29. It further alleges that, in or about November 2006, HUD became the holder of two new mortgages, one for Evergreen Terrace I and the other for Evergreen Terrace II. Id. ¶ 31.

"The cardinal rule of statutory construction is to ascertain and give effect to the legislature's intent, and the plain language of the statute is the best indication of that

3

intent." People v. Martin, 955 N.E.2d 1058, 1063 (Ill. 2011). "A court is not allowed to ignore the plain meaning by reading into it exceptions, limitations, or conditions that the legislature did not express." City of Chi. v. St. John's United Church of Christ, 935 N.E.2d 1158, 1172 (Ill. App. Ct. 2010) (citation omitted). Indeed, "[w]here the statutory language is clear and unambiguous, it will be given effect without resorting to other aids of construction." Harshman v. DePhillips, 844 N.E.2d 941, 948 (Ill. 2006) (citation omitted).

The 2007 Act expressly states that it "applies only to complaints to condemn that are filed on or after its effective date." 735 ILCS 30/90-5-5 (emphasis added). The 2007 Act's effective date is January 1, 2007. 735 ILCS 30/99-5-5. Thus, although the prior law was in effect when Joliet filed its original complaint on October 7, 2005, the 2007 Act was in effect when it filed the Second Amended Complaint on March 9, 2012.

Joliet argues that the 2007 Act should not apply because the Second Amended Complaint is not a new "cause of action" and because it relates back to the original complaint. These arguments are inconsistent with the 2007 Act's plain language, which states expressly that it applies to "complaints to condemn" filed after January 1, 2007. This language is unambiguous. The 2007 Act does not state that it applies to "causes of action" and contains no exception for amended complaints that might relate back to previously filed complaints. Nor does it state, as other Illinois statutes have, that it "does not apply to or affect any actions pending at the time of its effective date." Calamari v. Drammis, 676 N.E.2d 281, 284 (Ill. App. Ct. 1997) (quoting 735 ILCS 5/2-622(h)). The fact that the court granted Joliet leave to amend its complaint on or before March 9, 2012, see City of Joliet v. Mid-City Nat'l Bank of Chi., No. 05 C 6746, 2012 WL 638735, at *7

4

(N.D. Ill. Feb. 22, 2012), does not change this result. The relevant inquiry under the 2007 Act is whether a complaint to condemn was filed after January 1, 2007. Because the Second Amended Complaint was filed on March 9, 2012, the 2007 Act is applicable to this case.[1] See Flannery v. Recording Indus. Ass'n of Am., 354 F.3d 632, 638 n.1 (7th Cir. 2004) ("It is axiomatic that an amended complaint supersedes an original complaint and renders the original complaint void.").

## C. Joliet's Motion to Exclude Post-2005 Evidence

Joliet seeks to exclude all evidence that post-dates the 2005 filing of its condemnation complaint including, *inter alia*, physical improvements made to the Evergreen Terrace buildings and property, Joliet's own post-condemnation plans, post-2005 communications by councilmembers and others involved in the 2005 decision to condemn Evergreen Terrace, and evidence relating to current housing availability in Joliet. In response, New West, HUD, and four current residents of Evergreen Terrace (the "Tenants") (collectively, "Defendants") argue that post-2005 evidence is relevant to their Fair Housing Act affirmative defenses ("FHA defenses"), as well as to whether there is a valid public purpose for the condemnation.

Rule 401 provides that evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Rule 402 provides the corollary that, with certain exceptions, "[r]elevant evidence is admissible" and "[i]rrelevant evidence is not admissible." Fed. R. Evid. 402. "A party faces a significant

---

[1] The applicable subsection of the 2007 Act remains an open question that turns on whether Joliet intends to place Evergreen Terrace under public or private ownership and control. See 735 ILCS 30/5-5-5(b)-(f).

obstacle in arguing that evidence should be barred because it is not relevant, given that the Supreme Court has stated that there is a 'low threshold' for establishing that evidence is relevant." United States v. Boros, 668 F.3d 901, 907 (7th Cir. 2012) (quoting Tennard v. Dretke, 542 U.S. 274, 285 (2004)). "The question is not whether the evidence has great probative weight, but whether it has any, and whether it in some degree advances the inquiry." Davis v. Duran, 276 F.R.D. 227, 230 (N.D. Ill. 2011) (citing Thompson v. City of Chi., 472 F.3d 444, 453 (7th Cir. 2006)). "Relevance and prejudice under Rules 401 and 403 are determined in the context of the facts and arguments in a particular case, and thus are generally not amenable to broad *per se* rules." Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 387-88 (2008) (citing Fed. R. Evid. 401 advisory committee's notes). Lastly, "individual pieces of evidence insufficient in themselves to prove a point may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts." Huddleston v. United States, 485 U.S. 681, 691 (1988) (internal quotation marks and citation omitted). With these principles in mind, the court addresses Joliet's motion to exclude post-2005 evidence as irrelevant.

### 1. Post-2005 Evidence is Relevant to Public Purpose

The primary dispute concerns the relevance of post-2005 improvements to Evergreen Terrace. In 2001, four years prior to Joliet's filing of this case, New West notified HUD that Evergreen Terrace I would participate in a HUD program known as Mark-to-Market ("M2M").[2] The facts surrounding the M2M process are highly disputed. HUD issued a

---

[2] In 1997, Congress enacted the Multifamily Assisted Housing Reform and Affordability Act ("MAHRA"), which authorized HUD's M2M program. M2M was "designed to preserve low-income rental housing affordability while reducing the long-term costs of federal rental assistance, including project-based assistance from HUD, for certain multifamily rental projects." See U.S. Dept. of Housing & Urban Development, Mark-to-Market Program, *available at* http://portal.hud.gov/hudportal/HUD?src=/hudprograms/mtmp (last visited Oct. 26, 2012).

M2M restructuring commitment to New West for Evergreen Terrace I on May 16, 2003, which included, among other things, a HUD-insured first mortgage loan, HUD-held subordinate mortgage loans, and repair and improvements to Evergreen Terrace I to be paid for from the proceeds of the restructuring. See New West's Am. Proposed Findings of Fact ¶ 60. According to Defendants, Joliet, in response to this commitment, engaged in an extensive lobbying campaign aimed at reversing HUD's decision to approve refinancing, which ultimately led HUD to defer action on the M2M restructuring pending further reviews. Id. ¶ 61-63. New West claims that, but for Joliet's interference, it would have received HUD's M2M funds earlier, and that the improvements therefore would have commenced prior to 2005. Joliet tells a different story, explaining that it opposed the restructuring because it believed it would lead to a continuation of what it claims was a long history of neglect by the ownership. Joliet also notes that it had no authority to stop HUD from disbursing the M2M funds, and that any delay in federal funding was therefore HUD's doing. There is no dispute that, following the additional reviews, HUD decided to proceed with the M2M restructuring and, on September 8, 2005, issued a new M2M restructuring commitment for Evergreen Terrace I. Id. ¶ 64.

On October 4, 2005, the Mayor and City Council of Joliet approved and adopted Ordinance No. 15298 (the "Ordinance") declaring, *inter alia*, that Evergreen Terrace was blighted and a threat to the health, safety, and welfare of its residents. Second Am. Compl. ¶¶ 8-11, 13-15, 26. The Ordinance stated that Evergreen Terrace was "extremely dilapidated, unsafe and dangerous, substandard, unsanitary, crime-infested and a substantial threat to the health, safety and welfare of its residents, their families and guests, the owners and occupants of nearby properties and to the general public." Id. ¶ 8.

Pursuant to the Ordinance, "the City found that the abatement of these conditions, the elimination of the blight and the rehabilitation and redevelopment of the area requires that the City acquire the full fee simple title to the Subject Property." Id. ¶ 15. Three days later, the City filed the instant condemnation case. HUD issued the M2M restructuring commitment for Evergreen Terrace II on October 24, 2005.

Defendants claim that, following HUD's issuance of the M2M restructuring commitments, Joliet "continued to interfere with and derail the restructuring," resulting in the first M2M closing not occurring until November 6, 2006. New West's Resp. to Pl.'s Mot. to Exclude Post-2005 Evid. 4. Joliet denies that its actions had any impact on the date of the closing. There is no dispute that, following the 2006 closing, New West made over $5 million in standard repairs and capital improvements to the Evergreen Terrace property, including, as New West describes it:

> [R]epairs and capital improvements to the interiors and exteriors of the Evergreen Terrace apartment buildings; installation of a new state-of-the-art security system; new exterior fencing, landscaping, and lighting; tuckpointing and other façade work; extensive unit renovations of kitchens and bathrooms; construction of a Welcome Center staffed around the clock by a security company; installation of a commercial-grade children's playground; and installation of a new storm-sewer system for, and replacement of the parking lot at, Evergreen Terrace I.

Id. at 4-5; see also Fed. Def.'s Opp. to Pl.'s Mot. to Exclude Post-2005 Evid. 1. New West further notes that Evergreen Terrace has been near full occupancy for several years, with a waiting list exceeding 500 applicants. New West's Resp. to Pl.'s Mot. to Exclude Post-2005 Evid. 5. HUD contends that the alleged code violations that Joliet relied on in passing the condemnation ordinance have been eliminated and that, as a result of the security enhancements, the number of arrests at Evergreen Terrace has declined by nearly 73% between 2006 and 2011, whereas citywide arrests declined by just 26% during the

same time period. Fed. Def.'s Opp. to Pl.'s Mot. to Exclude Post-2005 Evid. 1-2. Joliet strongly disputes that blight no longer exists at Evergreen Terrace. See Additional Findings of Fact Proposed by Joliet ¶ 154-168. The court must now decide whether evidence that post-dates the 2005 Ordinance and condemnation complaint is relevant to the question of blight.

Both the Illinois Constitution and the Fifth Amendment of the United States Constitution impose two conditions on the State's authority to confiscate private property: the taking must be for a "public use" and "just compensation" must be paid. Ill. Const.1970, art. I, § 15; U.S. Const. amend. V.[3] The Supreme Court has long interpreted "public use" to mean "public purpose." Kelo v. City of New London, 545 U.S. 469, 480 (2005). Accordingly, a taking without a valid public use or public purpose is unconstitutional.

A determination to acquire property for a "public use" is an exercise of the legislative power that is "coterminous with the scope of the sovereign's police power." Hawaii Hous. Auth. v. Midkiff, 467 U.S. 229, 240 (1984). While "[g]reat deference should be afforded the legislature and its granting of eminent domain authority," Sw. Ill. Dev. Auth. v. Nat. City Envtl., L.L.C., 768 N.E.2d 1, 8 (Ill. 2002) (citing Berman v. Parker, 348 U.S. 26, 31-32 (1954)), "the exercise of that power is not entirely beyond judicial scrutiny," id. (citing Hawaii Hous. Auth., 467 U.S. at 241). Indeed, "it is incumbent upon the judiciary to ensure that the power of eminent domain is used in a manner contemplated by the framers of the constitutions and by the legislature that

---

[3] The final clause of the Fifth Amendment provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V. That Clause is made applicable to the States by the Fourteenth Amendment. See Kelo v. City of New London, 545 U.S. 469, 472 n.1 (2005) (citing Chi., B. & Q.R. Co. v. Chi., 166 U.S. 226 (1897)).

9

granted the specific power in question." Id. There is no dispute that, on its face, the eradication of blight constitutes a valid public purpose. See, e.g., People ex rel. City of Urbana v. Paley, 368 N.E.2d 915, 920 (Ill. 1977) ("It is well established that the elimination of a blighted area is itself a public purpose.").

Joliet argues that the public purpose determination must ignore all evidence that post-dates the 2005 Ordinance.[4] The law of eminent domain, however, does not support this result. As set forth above, a taking in Illinois "occurs on the date that the government (1) deposits the amount of compensation that has been ascertained and awarded, *and* (2) acquires title and the right to possess the property." Forest Preserve Dist. of Du Page Cnty., 961 N.E.2d at 786. As with just compensation, the current condition of Evergreen Terrace is relevant to whether the taking will effectuate the proffered public purpose at the time the title would transfer. See Daniels v. Area Plan Comm'n of Allen County, 306 F.3d 445, 466 (7th Cir. 2002) ("Much like the value of the property taken, 'public use' is to be determined at the time of the taking."); see also Harrison Eagle, LLP v. Town of Harrison, No. 06-cv-3074, 2007 WL 2790775, at *5 (D.N.J. Sept. 24, 2007) ("[A] condemnation action cannot proceed unless a public purpose exists at the time of taking."); Publ. Serv. Co v. B. Willis, CPA, 941 P.2d 995, 1000 (Okla. 1997) ("The necessity of taking private property for public purposes in eminent domain proceedings must be determined by conditions existing at the time of the taking."). Considering the current condition of Evergreen Terrace is also consistent with the 2007 Act, which states, through use of the present tense, that the necessary conditions must be present at the time the property is acquired, not the time the ordinance is enacted or condemnation complaint

---

[4] Because neither the Illinois Supreme Court nor intermediate appellate courts have directly addressed this issue, the court considers persuasive authority from other jurisdictions. See ADT Security Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist., 672 F.3d 492, 498 (7th Cir. 2012).

10

filed. See 735 ILCS 30/5-5-5(b)-(f) (requiring the condemning authority to prove that "the acquisition of the property is necessary for a public purpose.") (emphasis added); see also 65 ILCS 5/11-13-17 (allowing a condemning authority to acquire, by condemnation, "any buildings or structures which do not conform to the standards fixed by the corporate authorities . . . and all land which is necessary or appropriate for the rehabilitation or redevelopment of any area blighted by substandard buildings or structures.") (emphasis added).

Norfolk Redevelopment & Housing Authority v. C&C Real Estate, Inc., 630 S.E.2d 505 (Va. 2006) further supports this result. There, the Virginia Supreme Court addressed "whether a challenge to [a blight] determination arising many years later but before property has been acquired is resolved by examining the condition of the property at the time of the initial designation or at the time of acquisition." Id. at 509. Noting that it was an issue of first impression, the court concluded that:

> [W]hile the original determination retains the strong presumption of validity attached to such legislative acts, the current status of the property must be considered when determining whether the original purpose of the acquisition remains viable at the time the condemnation occurs. . . . Therefore, in this case, to rebut the presumption of validity, [the party opposing condemnation] bore the burden to show by clear and convincing evidence that the Property no longer was a blight. . . .

Id. at 509-10.[5] The court agrees with the approach of the Virginia Supreme Court. As in Norfolk Redevelopment, the current status of the Subject Property is relevant to whether the alleged original public purpose remains viable.

---

[5] Joliet attempts to distinguish Norfolk Redevelopment in two sentences by stating, without citation, that the case does not apply because it relies on a section of Virginia condemnation law that has no parallel in Illinois. As the Virginia Supreme Court stated, it's ruling on this issue "is dictated by the statutes governing conservation plans which allow the use of eminent domain only for the specific public purposes of eliminating deteriorating properties or arresting the blighting

The cases cited by Joliet are distinguishable in that they address "the problem of the blighted parts of the community on an area rather than on a structure-by-structure basis." Berman, 348 U.S. at 34. For example, in Charleston Urban Renewal Authority v. Courtland Co., 509 S.E.2d 569 (W.Va. 1998), the eminent domain challenger did not dispute the initial determination of blight, but rather asked the court "to make a new factual determination, based on allegedly new and changed circumstances." Id. at 576. The court denied the request, explaining that "the viability of an incremental, multi-year, integrated plan for the overall redevelopment of a slum or blighted area would be fatally compromised if challenges to the continued need for and legitimacy of the plan based on allegedly changed circumstances were allowed as defenses to a condemnation petition." Id. The court ultimately concluded that

> [A]bsent extraordinary circumstances, the authority of an urban renewal authority acting under the provisions of [West Virginia law] to implement an approved and ongoing redevelopment plan by using the power of eminent domain . . . may not be challenged during the period of the plan simply on the basis that the slum or blighted conditions which provided the initial basis for the adoption of the plan no longer exist.

Id.; see also Batmasian v. Boca Raton Cmty. Redevelopment Agency, 580 So. 2d 199, 201 (Fla. Dist. Ct. App. 1991) ("A logical consequence of the implementation of a redevelopment plan in any particular area is that some conditions of blight which once existed will be eliminated. Therefore, it is unreasonable to expect that the [condemning authority] demonstrate the existence of the same level of blight in 1989 that was present when the redevelopment plan was initially adopted in 1982.").

The renewal of blight findings in the context of urban renewal cases involving broad, integrated redevelopment plans to be implemented over long periods of time is not

influence." Norfolk Redevelopment, 630 S.E.2d at 510. Joliet points to no substantive differences between this standard and Illinois law.

analogous to the determination of blight in Joliet's attempted condemnation of Evergreen Terrace. The Supreme Court explained the differences between individual blight condemnations and large-scale urban renewal plans in Berman:

> The experts concluded that if the community were to be healthy, if it were not to revert again to a blighted or slum area, as though possessed of a congenital disease, the area must be planned as a whole. It was not enough, they believed, to remove existing buildings that were insanitary or unsightly. It was important to redesign the whole area so as to eliminate the conditions that cause slums—the overcrowding of dwellings, the lack of parks, the lack of adequate streets and alleys, the absence of recreational areas, the lack of light and air, the presence of outmoded street patterns. It was believed that the piecemeal approach, the removal of individual structures that were offensive, would be only a palliative. The entire area needed redesigning so that a balanced, integrated plan could be developed for the region, including not only new homes but also schools, churches, parks, streets, and shopping centers. In this way it was hoped that the cycle of decay of the area could be controlled and the birth of future slums prevented.

Berman, 348 U.S. at 34-35. In such large-scale urban renewal cases, there is a need for integrated, long-term planning that is closely tied to a vast array of community interests and needs. The condemning authority in such cases is afforded more deference, and, as set forth in Berman, may even take a non-blighted structure so long as it is within a properly designated blighted area. Id. at 35-36. The urban renewal cases cited by Joliet are not persuasive here because Joliet is not seeking to eradicate blight pursuant to a broad integrated redevelopment plan. The concern expressed in the above cases—that the consideration of changed circumstances would impede the ongoing implementation of an urban renewal plan—does not carry the same weight in the context of this single condemnation case.

13

Moreover, even if the court found such authority persuasive, other courts addressing large-scale urban renewal have found changed circumstances relevant. In 2004, the Colorado Supreme Court explained:

> Under our Urban Renewal Law, the only valid public purpose for which an urban renewal plan may be adopted is to eliminate or prevent the spread of slum or blight. Once that purpose has been achieved, an authority may no longer rely on a municipality's initial blight determination to condemn property because it can no longer exercise its condemnation powers in furtherance of a valid public purpose. Thus, where blight has been eliminated from a parcel that lies within an urban renewal area, an urban renewal authority no longer has any statutory basis to exercise its condemnation power over or for the benefit of that parcel.

Arvada Urban Renewal Auth. v. Columbine Prof'l Plaza Ass'n, Inc., 85 P.3d 1066, 1073 (Colo. 2004) (internal citations omitted). The court held that, because blight was no longer present, the condemning authority was "powerless to exercise its condemnation power over the [parcel at issue] unless the City of Arvada makes a new determination that the area [the condemning authority] seeks to condemn, in its current condition, is blighted." Id.; see also Aposporos v. Urban Redevelopment Comm'n of City of Stamford, 790 A.2d 1167, 1175 (Conn. 2002) (distinguishing Charleston Urban and holding that a redevelopment agency cannot "make an initial finding of blight and rely on that finding indefinitely to amend and extend a redevelopment plan to respond to conditions that did not exist, or to accomplish objectives that were not contemplated, at the time that the original plan was adopted"); Boelts v. City of Lake Forest, 127 Cal. App. 4th 116, 123, n.7 (Cal. App. Ct. 2005) ("Certain federal authorities could arguably be read for the proposition that the constitutional *public use* requirement means that there must be a current finding of *blight* anytime the eminent domain power is added to a redevelopment plan . . . we have determined that a new finding of blight was indeed

warranted by the *particular facts in this case* and that finding was *statutorily* authorized. .
. ."); cf. Vill. of Skokie v. Gianoulis, 632 N.E.2d 106, 114 (Ill. App. Ct. 1994) (finding
that a 1984 blight ordinance did not support a 1989 condemnation attempt because, *inter
alia*, the condemning authority had abused its power by "deliberately den[ying]"
defendants the means to correct the problems which are being used as evidence in favor
of condemnation"); Bd. of Educ., Pleasantdale Schl. Dist. No. 107 v. Vill. of Burr Ridge,
793 N.E.2d 856, 868 (Ill. App. Ct. 2003) (upholding trial court's consideration of "post-
ordinance developments" in the related context of Tax Increment Financing (TIF)
designations). The court agrees with the rationale set forth in these cases.

Finally, the court rejects Joliet's arguments based on Chicago Land Clearance
Commission v. Quinn Home Builders, 142 N.E.2d 60 (Ill. 1957). That case involved the
right of a land clearance commission to proceed under the Illinois Blighted Areas
Redevelopment Act of 1947 with respect to a "blighted vacant area." Id. at 61. The
defendants argued that the redevelopment plan at issue was no longer necessary because
of an increase in available housing and because the tax delinquencies present at the time
of the blight designation had largely been eliminated. Regarding tax delinquencies, the
court found that, based on the "chronology of events" at issue in the case, the change in
tax delinquent status was irrelevant. Id. at 63. Regarding the alleged increase in available
housing, the court declined to consider current conditions because defendants "did not
offer any evidence" of them. Id. These rulings are highly specific to the facts and
procedural posture of this 1957 case and do not stand for the general rule that Joliet
asserts.

15

In sum, because seven years have passed since the filing of the condemnation action and the parties agree that the Subject Property has benefited from $5 million in improvements, the court's public purpose analysis should consider the property as it exists today. The court has considered Joliet's additional arguments and finds them to be without merit.

### 2. Post-2005 Evidence is Relevant to the Fair Housing Act Affirmative Defenses

Post-2005 evidence is also relevant to discriminatory intent and discriminatory effect. Defendants contend that Joliet's stated public purpose—to eliminate blight and improve the health, safety, and welfare of the tenants—is a pretext for discrimination. To prove discriminatory intent, Defendants seek to rely, in part, on evidence that post-dates the City's 2005 Ordinance and complaint, including the current condition of Evergreen Terrace and communications by Joliet councilmembers involved in passing the Ordinance. Joliet argues that, because the FHA defenses challenge the validity of Joliet's proffered public purpose as of 2005, all evidence post-dating 2005 is irrelevant. Not so. Joliet's actions after the alleged 2005 discriminatory conduct can be probative circumstantial evidence of Joliet's knowledge and intent at the time of the alleged discriminatory act. See Hispanics United of DuPage Cnty. v. Vill. of Addison, 988 F. Supp. 1130, 1158 (N.D. Ill. 1997) ("The events before and after the Village passed the [challenged ordinance] revealed some further evidence of discriminatory intent.") (emphasis added); cf. Riordan v. Kempiners, 831 F.2d 690, 698-99 (7th Cir. 1987) ("The [district] judge excluded all evidence of events subsequent to [Plaintiff's] filing of her claim for discrimination . . . given the importance of circumstantial evidence in proving (and, equally, disproving) employment discrimination, a blanket exclusion of evidence of

events that occurred before or after the discrimination is arbitrary." (citation omitted));
Littlefield v. Mack, 752 F. Supp. 1417, 1418 (N.D. Ill. 1990) ("[P]ost-discrimination acts
can be probative of discriminatory intent."). As set forth above, the bar for relevance is
low and the evidence need only have "any tendency to make a fact more or less
probable." Fed. R. Evid. 401. With respect to discriminatory intent, post-2005 evidence
clears this low hurdle.

Post-2005 evidence is also relevant to disparate impact. Defendants allege that the
vast majority of the tenants at Evergreen Terrace are "very low income, African-
Americans for whom there is effectively no alternative housing in the city, a situation
exacerbated by Joliet's determination and actions to have nearly all the family public
housing in the city demolished. Elimination of Evergreen Terrace would force this
population from the majority-white west side of Joliet." Fed. Def.'s Answer to Sec. Am.
Compl., at Eleventh Defense. This defense refers to Joliet's demographics and access to
housing today, not in 2005. The court cannot ignore post-2005 evidence in determining
whether Joliet's attempted condemnation would have a disparate impact in violation of
the FHA. If Joliet has more targeted objections to specific post-2005 evidence
(objections that go beyond the argument that the evidence is irrelevant because it post-
dates 2005), Joliet may raise those objections during trial. The mere fact that evidence
post-dates 2005, however, does not warrant a finding that it is irrelevant to the FHA
defenses.

### 3. The Housing Authority of Joliet and Joliet's Post-2009 Communications with HUD

Joliet also moves to exclude post-2005 evidence regarding the Housing Authority of
Joliet's ("HAJ") alleged plans to eliminate public family housing throughout the City.

According to HUD, there is close cooperation and coordination between the HAJ and the City. HUD contends, and Joliet disputes, that the HAJ seeks to demolish 97% of its public family housing in Joliet, has demolished 106 units of public family housing at Poole Gardens since 2007, and wishes to demolish 168 more units of public family housing at Fairview Homes. Fed. Def.'s Opp. to Pl.'s Mot. to Exclude Post-2005 Evid. 16. HUD argues that this evidence is relevant to whether the displaced residents of Evergreen Terrace would be able to find alternate housing in Joliet, as well as to the City's official attitude toward minority residents of subsidized housing.

In response, Joliet argues that the HAJ is a separate entity and that none of the overlap or coordination between the two amounts to control by the City. Joliet contends that, because the HAJ's actions and decisions are its own, evidence relating to its plans for public housing in the City are irrelevant.

The court concludes that this evidence is relevant to the extent that it shows a lack of housing available to low-income families in Joliet, which bears directly on the impact condemnation would have on the minority residents of Evergreen Terrace. It is premature, however, for the court to determine whether Joliet and the HAJ are independent entities that operate without a common design. Accordingly, the court makes no determination at this time as to whether HAJ-related evidence is relevant to Joliet's alleged discriminatory intent. The parties may raise this issue during the course of trial.

Finally, Joliet argues that certain of its communications with HUD are "related to settlement efforts" and therefore are barred by Rule 408. Rule 408 prohibits the admission of evidence of statements made in compromise negotiations if offered as an

admission of the validity or invalidity of the claim or its amount under negotiation. Raybestos Prods. Co. v. Younger, 54 F.3d 1234, 1241 (7th Cir. 1995). Rule 408 does not require exclusion if the evidence is offered for purposes not prohibited by subdivision (a), "such as proving a witness's bias or prejudice [or] negating a contention of undue delay." Fed. R. Evid. 408(b). To establish that Rule 408 applies to a particular communication, a defendant must make a "substantial showing" that it was, in fact, "part of a settlement attempt." Raybestos Prods. Co., 54 F.3d at 1241. In making this determination, the court must "look at the totality of the circumstances." Id. The district court has broad discretion to admit evidence under Rule 408 for a purpose other than proving liability. See Zurich Am. Ins. Co. v. Watts Indus., Inc., 417 F.3d 682, 689 (7th Cir. 2005).

Here, Joliet has not made a "substantial showing" because the communications it seeks to exclude are not specifically identified in its motion. According to Joliet, the documents at issue are: "the communications between Joliet and HUD beginning in late 2009, when HUD threatened Joliet with the loss of its yearly federal grants, and continuing through the negotiations involving the AI [Analysis of Impediments to Fair Housing Choice] and the consultant's report Joliet provided to HUD regarding Evergreen Terrace." Pl.'s Mot. to Exclude Post-2005 Evid. 11. It is not clear specifically which documents or exhibits Joliet seeks to exclude. Joliet's Rule 408 motion is therefore denied without prejudice. Joliet may raise the issue if and when such evidence is proffered at trial.

### 4. Rule 403

Finally, the court rejects Joliet's contention that post-2005 evidence should be excluded under Rule 403. Rule 403 provides that the "court may exclude relevant

evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Rule 403's concerns carry significantly less weight in a bench trial, where there is a presumption that the court is not improperly influenced by the evidence brought before it. See United States v. Shukri, 207 F.3d 412, 419 (7th Cir. 2000) ("In a bench trial, we assume that the district court was not influenced by evidence improperly brought before it unless there is evidence to the contrary."); Ashford v. Gilmore, 167 F.3d 1130, 1136 (7th Cir. 1999) ("[T]he law presumes that judges are not influenced by improper evidence brought before them."); United States ex rel. Placek v. Illinois, 546 F.2d 1298, 1305 (7th Cir. 1976) ("[W]hen we have held that evidence was improperly admitted in a bench trial, we have refused to presume that the trial judge considered it in reaching his verdict."). Indeed, Rule 403 claims "are inapposite in a bench trial, where there is no risk of jury prejudice." United States v. Lim, 57 F. App'x 701, 704 (7th Cir. 2003); see also Lewis v. City of Chi., No. 98 C 5596, 2005 WL 693618, at *1 n.1 (N.D. Ill. Mar. 22, 2005) ("In the context of a bench trial, however, Rule 403 objections have no logical application and are routinely overruled.") (rev'd on other grounds). Accordingly, Joliet's motion to exclude post-2005 evidence pursuant to Rule 403 is denied.

## II. CONCLUSION

For the foregoing reasons, New West's Motion to Establish 2012 or Thereafter as the Relevant Date for Just Compensation Valuation, and Motion to Admit Evidence of Joliet's Failure to Comply with the 2007 Equity in Eminent Domain Act are granted. Joliet's Motion *in Limine* to Exclude Post-2005 Evidence is denied.

IT IS SO ORDERED.

ENTER:

CHARLES RONALD NORGLE, Judge
United States District Court

DATED: November 5, 2012