# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

CITY OF JOLIET, an Illinois Municipal      )
Corporation,      )
     )
         Plaintiff,      )
     )      No. 05 CV 6746
        v.      )
     )      Hon. Charles R. Norgle
MID-CITY NATIONAL BANK OF      )
CHICAGO, et al,      )
     )
         Defendants.      )

## OPINION AND ORDER

Before the Court are Defendants New West, L.P., New Bluff, L.P., *et al.* ("New West/New Bluff"), Teresa Davis, Alfreda Eubanks, Elvis Foster, and Arnetris Renee Griffin (collectively, the "Tenants"), and the United States Department of Housing and Urban Development's ("HUD") (collectively, "Defendants") motions to reconsider the Court's July 16, 2013 Order regarding the 2013 HUD Real Estate Assessment Center ("REAC") inspections. For the following reasons, the motions are denied.

## I. BACKGROUND

It is undisputed that, for more than a decade, ninety percent of the tenants living in the 356 units of Evergreen Terrace I and II ("ET" or the "property") have been, and are, African-American women with children. HUD REAC conducts physical inspections of properties subsidized by HUD to ensure that families have housing that is decent, safe, sanitary, and in good repair. Before 2012, the last REAC inspection of ET I and II occurred in 2005. According to HUD, REAC inspections were not conducted in 2006, 2007, 2008, 2009, 2010, and 2011 because of the renovations which were occurring at the property. On March 7, 2013, an attorney

for HUD, "pursuant to counsel's duty of candor," disclosed and delivered—for the first time—2012 REAC inspection reports, which were conducted approximately one year earlier in May of 2012 and July of 2012, to the Court and to Plaintiff the City of Joliet ("Joliet" or the "City"). It is undisputed that, at the very least, HUD and New West/New Bluff had knowledge of the 2012 inspections and reports at all times, yet Defendants chose to wait over five months into trial[1] to disclose the information to the Court and to Joliet. The two 2012 REAC inspections of ET I and the one 2012 REAC inspection of ET II resulted in failing scores with exigent health and safety violations. Six days after HUD's disclosure of the 2012 REAC reports, on March 13, 2013, Edward Hinsberger ("Hinsberger"), HUD's Director of Multifamily Housing for the Chicago Hub Office,[2] began his testimony, which included questions and explanations of the events surrounding the newly revealed 2012 REAC inspections.

**A. The 2012 REAC Inspections**

In April of 2012, an attorney for HUD told Hinsberger that REAC inspections of ET I and II needed to be conducted shortly because "[t]he new trial date in the Joliet case is September 27, [so] we need to get the inspections in hand and available to the City early enough that they cannot complain about getting them late." Pl.'s Ex. 822 [hereinafter PX]. Accordingly, REAC inspections of ET I and II were scheduled for May 17 and May 18, 2012. Subsequently, REAC Inspector Derrick Bozeman ("Bozeman") inspected ET I on May 17 and May 18, 2012.

Following the inspection of ET I, Jake Paschen ("Paschen"), president of New West/New Bluff, contacted Hinsberger regarding the inspection, purportedly concerned that only ET I was inspected and that the inspection took a day and a half. Hinsberger testified that he too, was concerned about the fact that the inspection of ET I took more than one day because that was

---

[1] The bench trial in this matter began on September 27, 2012.
[2] Hinsberger retired from his position at HUD sometime at the end of March 2013.

"out of standard." Although, Hinsberger admitted that HUD does not have a standard mandating that inspections take only one day, he maintained his position that the day and a half inspection of ET I was nevertheless "out of standard." Immediately following Hinsberger's testimony on this subject, the Court made a finding that, as the trier of fact, it did not believe Hinsberger's representation. The following exchange took place:

> THE COURT: You have repeatedly said your only objection to the results of the first inspection was that it took two days instead of one.
>
> MR. HINSBERGER: Yes.
>
> THE COURT: That's the statement you are committed to under oath in this courtroom, is that right?
>
> MR. HINSBERGER: Yes.
>
> THE COURT: Under oath in this courtroom today.
>
> MR. HINSBERGER: Yes.
>
> THE COURT: I'm going to make a credibility determination right now. I don't believe it. The trier of fact does not believe it. Proceed.

Trial Tr. vol. 45, 7612, Apr. 8, 2013.

On May 24, 2012, Hinsberger was informed that ET I scored 57c, which is a failing score with the "c" indicating serious exigent health and safety violations. Hinsberger also discovered that HUD sent New West/New Bluff a letter, dated March 21, 2012, providing the failing score and a summary report of the inspection. Hinsberger then sent the following email to HUD REAC: "I just learned that the inspector was a person that I asked in the past **never** to inspect another project of ours. I am asking that the inspection be declared out of standard. Inspections aren't supposed to take two days to complete." PX 837-k. Sometime shortly thereafter, the inspection of ET I was deemed out of standard and removed or purged from the HUD REAC

computer system. In June of 2012, Hinsberger discovered that the May 2012 REAC inspection

had somehow been reposted in the computer system. Hinsberger testified that he then took steps

to ensure that the "out of standard" inspection was once again removed from the computer

system. He explained:

> MR. FIGLIULO: And do you understand the reason for the urgency in trying to get this inspection off of the system?
>
> MR. HINSBERGER: Well, it's posted as an inspection. And if it's not an inspection, it would – it would cause issues and it would cause confusion.
>
> MR. FIGLIULO: It was an inspection, there's no question it was an inspection, right?
>
> MR. HINSBERGER: It was an inspection, yes.
>
> MR. FIGLIULO: And who was going to be confused? Who were you concerned about being confused by seeing an inspection report on the system that showed that the property failed to meet HUD's standards?
> Who was going to be confused?
>
> MR. HINSBERGER: Well, if there's an inspection that's a legitimate inspection, then my staff is required to take certain action, so it would be – it would be a problem for my staff. I mean, I needed to know was this a good inspection or was this not a good inspection. I mean, that's – I mean, it would cause problems for others, too, I suppose, looking, you know –
>
> MR. FIGLIULO: Like who?
>
> MR. HINSBERGER: Well, it would – could pose a problem for the owners or for the City if they were looking at it.
>
> MR. FIGLIULO: If the City looked at it, they would see that in 2012 after millions of dollars and years of rehab, the property was still failing to meet HUD's standards, and that would be a problem for you, right?
>
> MR. HINSBERGER: Well, it could be a problem for the City.
>
> MR. FIGLIULO: It would be a problem for the City because they would see that and then talk to HUD about why they're not taking action to provide decent housing for the people who live there?
>
> MR. LAPERTOSA: Objection, foundation.

THE COURT: You may answer.

MR. HINSBERGER: They could do that, yes.

Trial Tr. vol. 45, 7595-7596, Apr. 8, 2013. It is undisputed that Hinsberger was successful in having the inspection removed once again.

Although Bozeman, the inspector at issue, had rescheduled the inspection of ET II for later in May of 2012, Hinsberger admitted that he tried, and succeeded, in having Bozeman "thrown off" the ET II inspection which was to follow.

MR. FIGLIULO: Did you try to get him thrown off of the inspection?

MR. HINSBERGER: Yes.

MR. FIGLIULO: And you succeeded, right?

MR. HINSBERGER: He did not do the future inspection.

Id. at 7579. Ultimately, the inspection of ET II was cancelled and new 2012 REAC inspections for both ET I and II were scheduled for July of 2012. Two different inspectors conducted the July 2012 REAC inspections of ET I and II; both inspections resulted in failing scores.

The July 2012 inspection of ET I resulted in a score of 46c*, which was even lower than the May 2012 inspection score that had been declared out of standard. Significantly, the July 2012 inspection of ET I, like the May 2012 inspection of ET I, took two days to complete; however, the July 2012 inspection of ET I was not declared out of standard for that reason. See id. at 7609–7612. In August of 2012, New West/New Bluff appealed the results of the July 2012 inspection of ET I with REAC. Following the appeal of ET I, the property still received a failing score.

Meanwhile, the results of the July 2012 REAC inspection of ET II were withheld, at the request of HUD, until September of 2012. Once those results were released, New West/New

Bluff once again filed an appeal with REAC. The appeal of ET II's inspection also resulted in a failing score for the property—a failure to meet HUD's standards for decent, safe, and sanitary housing. Accordingly, HUD sent notices of default to New West/New Bluff at the property. However, Hinsberger testified that on November 13, 2012, he received a phone call from Delton Nichols at REAC who informed him that the July 2012 inspections of ET I and II were being declared out of standard, and told him to retract the notices of default. Hinsberger stated that he did not know why the July 2012 inspections were declared out of standard. Nevertheless, the results of all three 2012 REAC inspections were removed from the IREMS computer system, the real estate management system for HUD REAC, and the REAC and HUD websites. While HUD informed New West/New Bluff immediately that all of the inspections were declared out of standard and removed from the system, that information—and indeed the very existence of the 2012 inspections—was not disclosed to the Court or to Joliet until March 7, 2013.

**B. Joliet's Motion In Limine to Bar Evidence of Additional Inspections**

On April 4, 2013, Joliet filed a Motion in Limine to Bar Evidence of Additional Inspections of Evergreen Terrace I and II. In the motion, Joliet argued, *inter alia*, that Defendants should be barred "from manufacturing additional evidence through the use of REAC inspections intended to be used for litigation purposes, after Joliet has presented its case-in-chief, after key witnesses for the Defendants have testified and the trial has been ongoing for over five months." City of Joliet's Mot. In Limine to Bar Evidence of Additional Inspections of Evergreen Terrace I & II, at 2. Furthermore, Joliet argued that it had already been prejudiced by the late disclosure of the 2012 REAC inspections.

Specifically, Joliet argued that because it did not have knowledge of the three failed 2012 REAC inspections, it was unable to effectively cross-examine three of Defendants' witnesses—

6

Paschen (the president and corporate representative for New West/New Bluff), Theodore Toon, (the director of HUD's Office of Multi-Family Development, formerly the Director of HUD's Office of Affordable Housing Preservation ("OAHP")), and Jerry Anderson (the Deputy Director of OAHP, formerly an executive of Heskin Signet, the firm involved in the underwriting of the 2006 restructuring)—all of whom testified as to the condition of the property. Notably, during Paschen's testimony, Defendants presented a video produced on November 2, 2012—in which Paschen participated—which purported to show the current conditions at ET I and II. The video was made and admitted into evidence at a time when both HUD and New West/New Bluff were aware that the appeals of the 2012 inspections had failed, and that REAC had determined that the property did not meet HUD's standards for decent, safe, and sanitary housing.

In addition, Joliet highlighted the circumstances surrounding the scheduling of the 2012 REAC inspections in relation to the instant litigation, the removal of the inspections from HUD's computers and databases, and the decisions declaring all three inspections "out of standard." Joliet argued that "[a]ny other inspections would lack reliability and credibility as evidence in light of the Defendants' manipulation and concealment of the 2012 inspections." Id. at p. 6, ¶ 11.

## C. The Admissibility of the 2013 REAC Inspections

While the briefing schedule continued on Joliet's motion in limine, new REAC inspections of ET I and II took place on April 23 and 24, 2013. The Court noted that it intended to rule on Joliet's motion in limine with respect to the admissibility of the 2013 REAC inspections. During trial on June 19, 2013, the following exchange took place between the Court and an attorney for HUD, Max Lapertosa ("Lapertosa"):

> MR. LAPERTOSA: Your Honor, I have one other matter that's not related to anything Mr. Ruskusky just said.

It concerns one of the witnesses that we had planned to call next week. That witness was Rhonda Caplinger who was the inspector for the 2013 REAC.

We had informed Joliet that we had planned to put her on the stand on the next -- on the 26th. She is based in the Indianapolis area, so she would be coming up from out of town.

I understand -- I understood last week that the Court had stated that it wanted to rule on Mr. Figliulo's motion to exclude the 2013 REAC. What I would ask is that she be allowed to testify because I do think her testimony would be relevant to how the Court would rule on that, on that motion.

THE COURT: Do you expect that she would testify in any way inconsistent with what she has put in that report?

MR. LAPERTOSA: Well, no. I don't think she would be testifying on the report itself or her findings.

I think what she would say is how -- is how the inspection occurred because the basis of Mr. Figliulo's -- the basis of Joliet's motion is -- you know, as I understand it in part is that the REAC was somehow not a real REAC, that is was concocted, that it was done -- you know, they said it was done in an hour.

We put -- we submitted an affidavit or a declaration from Ms. Caplinger as part of a surreply because we didn't, when this motion was filed, there were no REAC --

THE COURT: Well, who ordered her to conduct the inspection?

MR. LAPERTOSA: Pardon?

THE COURT: Who ordered her to conduct the inspection?

MR. LAPERTOSA: Well, she would have been assigned by HUD to conduct the inspection.

THE COURT: Who?

MR. LAPERTOSA: She is a HUD employee --

THE COURT: Who? Who?

MR. LAPERTOSA: -- and what she would testify --

THE COURT: Who? Who ordered her to conduct the inspection?

MR. LAPERTOSA: Well, it would have been done through the REAC -- through the REAC center in Washington.

THE COURT: Are you refusing to give me a name?

8

MR. LAPERTOSA: The exact name of who ordered --

THE COURT: Yes. The exact name could be John Smith.
But what is the name of the man who ordered her to conduct the inspection? Or woman?

MR. LAPERTOSA: I'm -- the only reason I'm reluctant to give you a name is I'm not sure exactly who would have ordered her to do it. I do know that --

THE COURT: Well, you have represented to the Court that this was somehow routine.

MR. LAPERTOSA: Yes.

THE COURT: And I'm asking you if someone, some individual ordered her to conduct the inspection which she carried out, and who is the person and when did he order her to do it?[3]

MR. LAPERTOSA: Well, I think she would testify to all that.

THE COURT: Well, you could tell me that, if you know.

MR. LAPERTOSA: I don't know at this point.

THE COURT: Well, you could find out quickly.

MR. LAPERTOSA: I could find out.

THE COURT: That's a very simple request.

MR. LAPERTOSA: Yes, I can find that out.

THE COURT: All right.

MR. LAPERTOSA: I can find that out. I don't know off the top of my head right now, and I don't want to give you an incorrect answer. But I can find that out.
But the point, Judge, is that Ms. Caplinger would testify, first of all, that the inspection really did constitute two days for Evergreen Terrace I and Evergreen Terrace II.

THE COURT: Yeah, 23rd and '4th of April.

MR. LAPERTOSA: Pardon?

THE COURT: April 23, April 24.

---

[3] For reasons discussed *infra*, the answer to the Court's question remains unclear.

MR. LAPERTOSA: Yes, yes. And that it was done, you know, basically similar to every other inspection that she has done. That it was not, you know, concocted in the backroom. I didn't write it up. It wasn't a fake inspection.

It was done pursuant to the same policies that she has used for all of her other inspections.

I think that testimony would be relevant to whether the Court then decides to exclude or not the 2013 REAC reports.

THE COURT: <u>Well, a part of it is the issue of whether the inspection was ordered as part of litigation; that it would be a litigation attempt by a party which would affect its admissibility or its weight. And there are a number of cases that would support that inquiry.</u>

<u>So if you have represented that this was strictly routine and not -- was not done for purposes of litigation, the follow-up question by the Court is, who ordered her to do it and when did you order her to do it?</u>

MR. LAPERTOSA: I can find that out for you.

THE COURT: Okay. Let's leave it there. Okay.

MR. LAPERTOSA: Well, Judge, I plan on bringing her up next week. I just want to let the Court know that. We have told Joliet that she would be the witness we would be calling. She would be one of the witnesses we would be calling.

THE COURT: Well, she may or may not be a witness. But she's in Indianapolis.

MR. LAPERTOSA: She's in Indianapolis.

THE COURT: All right. Do they have Section 8 housing there?

MR. LAPERTOSA: Pardon?

THE COURT: Do they have Section 8 housing there?

MR. LAPERTOSA: I assume so. It would be on the HUD website.

THE COURT: All right. It's a small world. We look forward to seeing her if she does testify.

Court is adjourned.

Trial Tr. vol. 67, 11669-11673, June 19, 2013 (emphasis added). Despite the Court's inquiry and

HUD's promise to provide the Court with the name of the person who ordered the 2013 REAC

inspections so that it could rule on Joliet's motion in limine, no such disclosure was made until July 24, 2013, when HUD filed the instant motion to reconsider.

On July 16, 2013, during the testimony of Linda Capriotti, the Court was once again presented with the issue regarding Joliet's then-pending motion to exclude the admission of the 2013 REAC inspection reports.

MR. POLALES: So did you attend any of the REAC inspections in 2012?

MS. CAPRIOTTI: Yes.

MR. POLALES: Which ones?

MS. CAPRIOTTI: I attended the Evergreen Terrace I and the Evergreen Terrace II inspections.

MR. POLALES: Okay. And, Judge, at this point I'm going to move into something that is presently the subject of a motion in limine. And we came to this point in Kuiken's as well.

THE COURT: What is it? What is it?

MR. POLALES: It's 2013 REAC inspections, Judge. And I want to lay the foundation for inspection reports. I understand that your Honor has it under advisement, but this is the witness that will do it. We understand that Ms. Capriotti --

THE COURT: Is this the one that took place on 4 -- April 22nd and April 23rd?

MR. POLALES: Right.

THE COURT: The two days.

MR. POLALES: Right.

THE COURT: Well, a part of this was the counsel for HUD made a representation that he would have an affidavit. I haven't seen it.

MS. ELENGOLD: Your Honor, there was an affidavit submitted as part of the surreply. It was submitted to the Court in response to Joliet's motion in limine from Rhonda Caplinger, C-A-P-L-I-N-G-E-R. She is also scheduled to testify.

THE COURT: Well, what did she say briefly in her affidavit?

11

MS. ELENGOLD: She says she was the REAC inspector. She was the one that actually went out on behalf of HUD REAC to do the inspection on those dates and that they were done as REAC inspections were usually done. That's the grit of it.

THE COURT: That this was routinely done and not -- not reactionary to the difficulties that Mr. Hinsberger was having on the stand with respect to the purging issue from the computer?

MS. ELENGOLD: Well, the REAC was done, yes, in the regular course of business.

THE COURT: Okay. Let's leave it here: Do you have a copy of that affidavit?

MS. ELENGOLD: I can get it for you at lunch, your Honor.

THE COURT: All right. Then do that please, and we'll come back in an hour.

MR. POLALES: In an hour?

THE COURT: Yes.

MR. POLALES: Thank you, your Honor.

(Proceedings recessed at 12:07 to 1:07 p.m.)

. . . .

MS. ELENGOLD: Your Honor, while we wait for the witness, I have a copy of the affidavit. And I want to apologize to the Court. I think in my brain I had completed what I think -- what I understand the testimony was going to be and what's in the affidavit. So I apologize for that. Here is the affidavit itself.

(Pause.)

THE COURT: Are you talking, counsel, about the declaration of Rhonda Caplinger?

MS. ELENGOLD: Yes, your Honor. Rhonda Caplinger was the REAC inspector for HUD who did the April 2013 inspections at Evergreen Terrace I.

THE COURT: Now just a minute. You misrepresented something before the break.

MS. ELENGOLD: As I said, I apologize to the Court.

THE COURT: Is that what it is?

MS. ELENGOLD: It was not a misrepresentation. It was a mistake, and I do apologize.

THE COURT: But this is not the first time this has come up. You made a misrepresentation as to what this affidavit says.

MS. ELENGOLD: Your Honor, I --

THE COURT: The question was the routineness of the inspection. And you made representation.

MS. ELENGOLD: Your Honor, I did make a representation.

THE COURT: Let me say this. This is not a matter of apology. You are admonished this should not happen again. This by no means is the kind of affidavit that HUD said an attorney for HUD represented that he would have.
Now you can make whatever statement you want to make.

MS. ELENGOLD: Your Honor, Ms. Caplinger is the REAC inspector. As it states in the affidavit, she's a quality -- let me get the words correct -- a quality assurance inspector for HUD's real estate assessment center.
She was the inspector who did the inspection, actually went out to Evergreen Terrace I and II property for the REACs that are at issue in the City of Joliet's motion in limine.
And she is currently scheduled to come to Chicago and testify. We have one trial date on Thursday. Then the next trial date is July 29th. And she is currently scheduled to be here to testify. And she will be able to tell the Court exactly what she did, exactly on whose orders she did her work, and then be subject to cross examination.
And so we would request that the Court reserve ruling on the City of Joliet's motion in limine until it can hear from the person who actually went out and did the inspection. And she can state exactly how she did it under oath, under what circumstances she did the inspection.

THE COURT: The sanction for your misrepresentation to the Court and the assertion earlier by counsel on behalf of HUD that you would have an affidavit by someone in the higher position than the inspector herself to say that this inspection was carried out routinely and not on the heels, so to speak, of the testimony of Hinsberger, that was represented by another attorney for HUD, that affidavit is not before the Court.
And you made a misrepresentation before the break as to what the affidavit says. And this by no means deals with the issue. And therefore, the sanction is imposed

for this reason as a sanction and also for the reasons raised by Joliet, that report is inadmissible, and the testimony of that inspector is barred.

MS. ELENGOLD: With all due respect, your Honor, I --

THE COURT: You may proceed with the witness.

MS. ELENGOLD: For the record, your Honor, I do --

THE COURT: You may proceed with the witness. I have made my statement.

MR. POLALES: Does that sanction apply to the ownership's --

THE COURT: The report is inadmissible, and that witness is barred from testifying.

MR. POLALES: May I ask for the record if she can authenticate the document you are going to exclude?

THE COURT: You may proceed with the witness, nothing to do with the document. The document is inadmissible. The testimony of the inspector is barred for the reasons I have just said.

Trial Tr. vol. 70, 12049-12056, July 16, 2013. Accordingly, the evidence was excluded as a sanction against HUD as well as for the reasons set forth in Joliet's motion in limine. Two days later, the Court granted Joliet's Motion In Limine to Bar Evidence of Additional Inspections of Evergreen Terrace I and II.

**D. Motions to Reconsider**

On July 18, 2013, New West/New Bluff filed its motion to reconsider, shortly followed by HUD's motion on July 24, 2013. The Court denied the Tenants' motion to join New West/New Bluff's motion to reconsider and ordered them to file their own "distinct and individual" motion "[a]fter due diligence to include examining the transcripts of remarks made by Mr. Lapertosa, counsel for HUD, on June 19, 2013." Order, July 15, 2013 (entered July 29, 2013). Over two months later, on October 7, 2013, the Tenants filed their motion to reconsider. The Court notes that although the Tenants were specifically directed to the words spoken by

Lapertosa, the Tenants' submission contains only a limited capturing. The reluctance of the named Tenants to fairly and comprehensively lay out the exchange between Lapertosa and the Court as contained in transcript pages 11669 through 11673 underscores the issue and supports the earlier ruling of the Court requiring the Tenants to file their own distinct and individual motion. Nevertheless, the instant motions are fully briefed and before the Court.

## II. DISCUSSION

### A. Standard of Decision

The Court construes Defendants' motions to reconsider the Court's interlocutory order, barring the testimony of Rhonda Caplinger and the admission of the 2013 REAC inspection reports and granting the City's motion in limine, as brought pursuant to Federal Rule of Civil Procedure 59(e). "[F]or relief under Rule 59(e) the movant must demonstrate a manifest error of law or fact or present newly discovered evidence." Boyd v. Tornier, Inc., 656 F.3d 487, 492 (7th Cir. 2011) (citations omitted). Rule 59(e) "requires that the movant clearly establish one of the aforementioned grounds for relief." Harrington v. City of Chi., 433 F.3d 542, 546 (7th Cir. 2006) (internal quotation marks and citations omitted). "This rule enables the court to correct its own errors and thus avoid unnecessary appellate procedures." Miller v. Safeco Ins. Co. of Am., 683 F.3d 805, 813 (7th Cir. 2012) (internal quotation marks and citation omitted). Whether to grant or deny a Rule 59(e) motion "is entrusted to the sound judgment of the district court." In re Prince, 85 F.3d 314, 324 (7th Cir. 1996); see also Miller, 683 F.3d at 813.

### B. Rule 59(e) Motions to Reconsider

As an initial matter, New West/New Bluff and the Tenants argue that the sanction against HUD resulting in the exclusion of the 2013 REAC inspections should not be extended to the other Defendants, who did not have personal knowledge of the answers to the questions asked by

the Court. Indeed, the sanction applies only to HUD. Nevertheless, the Court also excluded the evidence as to all Defendants for the reasons raised by Joliet in its motion in limine—namely, due to unassuaged concerns that the 2013 inspections were ordered, conducted, and manufactured as a litigation tactic. It bears reiterating for the purposes of the instant motion that Defendants have repeatedly maintained that it is their position that they are presenting a "joint" defense and litigation of their counterclaims.

### 1. Excluded as a sanction against HUD

As to the sanction, HUD argues that the Court erred for two reasons: (1) "counsel for HUD had never promised the Court that it would submit a declaration from a REAC employee other than Ms. Caplinger and counsel was unaware until July 16 that the Court was expecting such a declaration"; and (2) "exclusion of the two inspection reports and of Ms. Caplinger's entire testimony was a disproportionate sanction for counsel unintentionally misrepresenting part of the content of Ms. Caplinger's testimony." Def. Dep't of Hous. & Urban Dev.'s Mot. for Reconsideration With Respect to NW/NB Trial Exhibits 516 & 517 & the Testimony of REAC Inspector Rhonda Caplinger, at 2 [hereinafter HUD's Mot. to Reconsider].

First, although HUD correctly states that the Court did not specifically order the production of an affidavit or a declaration, it is clear that on June 19, 2013 the Court asked HUD to produce the identity of the person who ordered Caplinger to conduct the inspections and when that person ordered her to do it—a request with which HUD, through its counsel Lapertosa, specifically promised to comply.

> THE COURT: Well, a part of it is the issue of whether the inspection was ordered as part of litigation; that it would be a litigation attempt by a party which would affect its admissibility or its weight. And there are a number of cases that would support that inquiry.

So if you have represented that this was strictly routine and not -- was not done for purposes of litigation, the follow-up question by the Court is, who ordered her to do it and when did you order her to do it?

MR. LAPERTOSA: I can find that out for you.

THE COURT: Okay. Let's leave it there. Okay.

Trial Tr. vol. 67, 11672, June 19, 2013 (emphasis added). Given the Court's manifest directive, HUD cannot now—nor on July 16, 2013—feign ignorance of this request simply because the Court used the term affidavit in one instance and not the other. Furthermore, HUD made no attempt to produce an answer to the Court's "simple request"—through affidavit or otherwise—until its instant motion to reconsider. See id. at 11671 ("COURT: That's a very simple request. MR. LAPERTOSA: Yes, I can find that out."). The Court's question and intent was clear. HUD's attempt to avoid its promise to produce the information by relying on the Court's request for an "affidavit" in particular is unavailing and does not constitute a manifest error of law or fact to warrant reconsideration of the sanction.

Second, HUD argues that the sanction imposed was disproportionate to the circumstances surrounding the misrepresentation made by counsel for HUD, Kate Elengold ("Elengold") on July 16, 2013. The Court is entitled to great deference in construing its orders; and, "[w]hen considering a motion to exclude evidence, a district court should take into account whether the government acted in bad faith and whether any unfair prejudice to the [plaintiff or other defendants] can be cured by a less severe alternative." United States v. Herrera, 366 F. App'x 674, 676 (7th Cir. 2010) (non-precedential order). HUD argues that although Elengold "clearly misstated the content of the Declaration, [she] corrected the misstatement at the earliest possible moment" and "[n]o party was prejudiced by her action." HUD's Mot. to Reconsider, at 6.

17

However, in issuing the sanction, the Court relied on both Elengold's misrepresentation on July 16, 2013 and Lapertosa's unfulfilled promise made on June 19, 2013. The Court said:

> The sanction for your misrepresentation to the Court <u>and</u> the assertion earlier by counsel on behalf of HUD that you would have an affidavit by someone in the higher position than the inspector herself to say that this inspection was carried out routinely and not on the heels, so to speak, of the testimony of Hinsberger, that was represented by another attorney for HUD, that affidavit is not before the Court.
> And you made a misrepresentation before the break as to what the affidavit says. And this by no means deals with the issue. And therefore, the sanction is imposed for this reason as a sanction and also for the reasons raised by Joliet, that report is inadmissible, and the testimony of that inspector is barred.

Trial Tr. vol. 70, 12055-12056, July 16, 2013 (emphasis added). The Court made it clear on June 19, 2013 that it would not rule on Joliet's motion to exclude the 2013 inspections—or let Caplinger (the inspector) testify—until HUD proffered the name of the person who ordered the inspection. See Trial Tr. vol. 67, 11672-11673, June 19, 2013 ("MR. LAPERTOSA: Well, Judge, I plan on bringing [Caplinger] up next week. I just want to let the Court know that. We have told Joliet that she would be . . . one of the witnesses we would be calling. THE COURT: Well, she may or may not be a witness. But she's in Indianapolis."). Despite Lapertosa's representations to the Court, none of the attorneys for HUD provided the information requested, thereby delaying the Court's decision on Joliet's motion in limine to the prejudice of all parties.

In addition, the affidavit which Elengold claims to have "unintentionally misrepresented" was Caplinger's, not the person who ordered her to do the inspection. It contains six paragraphs, wherein Caplinger merely describes the amount of time that it took her to complete the inspections; it contains no information as to the routine nature of the inspection or how it came to be. Moreover, the affidavit was filed on May 3, 2013 and referenced by Lapertosa on June 19, 2013. It is disingenuous to suggest that nearly a month later, on July 16, 2013, counsel believed that it contained the answer to the Court's question.

18

Furthermore, this was not the first time during trial that the conduct of HUD or one of its witnesses had been called into question. One such instance occurred on March 7, 2013, when the Court was faced with HUD's untimely disclosure of the 2012 REAC inspections. During trial on March 11, 2013, the first day of trial following HUD's disclosure, the Court made the following statement:

> We can deal with this in greater detail later. But my reaction when I read this, I was taken aback. It was a major surprise to me, totally unawares that this inspection had occurred as indicated in those exhibits and that there was a failure which apparently was in due course corrected according to the documents.
>
> But to receive this from HUD was a major surprise to me. This is a governmental agency, part of the United States. And my quick reaction was that this should have been disclosed shortly—shortly after the information was available. Whether there was an agreement between counsel or not, it was the kind of material, and this is my quick reaction, is that responsible attorneys would let the other side know, this is what happened here.
>
> Mr. Anderson, for example, was saying things are going to be in good shape for 20 years. I don't know if he knew that this investigation, this examination of the premises had gone on and that there was at least in the first instance a failure.
>
> If he were on the stand and if Mr. Figliulo and the named tenants and the owners had this information, it might have been at least the subject of a few questions to him to challenge his position that we've taken care of this property by way of this infusion of money and increased rents and so on to protect the interests of the stakeholders for 20 years.
>
> So I was surprised by it. I expected more from a governmental agency. I understand that this is civil litigation, but my immediate reaction was, this should not have occurred in this fashion. It should have been brought to the Court's attention early on at least to let the Court know about this and then to decide whether there should be production by HUD or other parties.
>
> It could have been presented in camera. It could have been presented ex parte at least for the Court to look at and determine whether there should be an immediate or more timely disclosure. I was surprised by it.
>
> But I want to get on with the trial and leave this for later.

Trial Tr. vol. 37, 6100-6103, Mar. 11, 2013. Two days later, HUD's witness Hinsberger took the stand. Hinsberger faced multiple hurdles during his testimony, including: (1) the Court finding that it did not believe Hinsberger's statement that the March 2012 inspection was out of standard because it took more than one day; (2) cross-examination regarding Hinsberger's role in the

19

deletion of the inspection reports from HUD's computer systems; and (3) multiple issues with respect to Hinsberger's possession of various notes that were not previously disclosed. For instance, on April 9, 2013, the Court once again addressed the issue of undisclosed notes with Hinsberger while he was testifying:

> MR. FIGLIULO: Have you given those notes to counsel?
>
> MR. HINSBERGER: No, I have not.
>
> MR. FIGLIULO: And where are they?
>
> MR. HINSBERGER: I don't know. I could look for them. I don't know where they are at.
>
> MR. FIGLIULO: Will you look for them?
>
> MR. HINSBERGER: Yes.
>
> THE COURT: Well, that's where we left off yesterday. Now when you left this courtroom yesterday was it your understanding, or were you confused on the issue, that you were going to gather together all of the notes that you had and give them to counsel for HUD the following morning, which would be today?
>
> MR. HINSBERGER: I—what I understood from yesterday was I should find my notes relative to the inspections that we were talking about.
>
> THE COURT: And you produced two pages of notes?
>
> MR. HINSBERGER: Yes.
>
> THE COURT: And now you're saying here today that there are other notes that you never turned over to counsel for HUD.
>
> MR. HINSBERGER: Correct.
>
> MR. LAPERTOSA: Your Honor, if the notes are still with HUD they are—
>
> THE COURT: This is on the edge of sanctions. This is on the edge of sanctions. Perhaps we will deal with that later. Let's get on with the inquiry here.
>
> MR. FIGLIULO: Will you agree to preserve those notes and to deliver them to your counsel?

MR. HINSBERGER: Yes, if I—I'll look for them tonight.

THE COURT: Just a minute. When was the last time you saw them?

MR. HINSBERGER: I—I don't know. It's been—

THE COURT: Are you saying you're going to look for them or do you have them?

MR. HINSBERGER: Hopefully I have them.

THE COURT: Do you have them?

MR. HINSBERGER: I don't know. I have to look. I'll see.

THE COURT: Where would you look?

MR. HINSBERGER: I've got documents—copies of documents that I have been given since—

THE COURT: All right. If this keeps up what I intend to do is to issue a rule to show cause why this witness should not be held in contempt of court. If this is not clarified somehow here today, I'm seriously considering a rule to show cause against this witness on this production of documents and notes.

So counsel are admonished and advised. If it isn't cleared up, the Court is seriously considering the issuance of a rule to show cause with respect to this witness and the failure to produce the notes. Or notes generally. You may inquire further. . . . .

. . . .

THE COURT: It is no longer a request. It is the order of the Court that every note that you have taken relating to this case be turned over tomorrow morning to counsel for HUD in the first instance. Do you understand that order?

MR. HINSBERGER: Yes, I do.

Trial Tr. vol. 46, 7721-7725, Apr. 9, 2013.

Lastly, HUD argues in its reply that that the sanction was improper because it was based on the violation of an oral directive of the Court, not a written order. See Schmude v. Sheahan, 420 F.3d 645, 651 (7th Cir. 2005) ("District courts can sanction attorneys for not obeying orders. Even if an order was issued in error, the collateral bar doctrine obligates counsel to follow it.

However, a court's oral directive, without more, is not binding on counsel." (internal citations omitted)). However, given that, throughout this trial, the parties have obtained and reviewed daily transcripts, HUD's purported reliance on a written order is unavailing. Furthermore, a review of the various transcripts would have relieved any confusion counsel for HUD allegedly had regarding the Court's questions in open court—as demonstrated by the Court's reproduction of those transcripts herein. In any event, the sanction was imposed as a result of the misrepresentation made by Elengold, not just HUD's failure to provide an answer to the Court's oral question asked a month earlier. Thus, this argument is rejected.

Based on the prejudice caused by HUD's delay in answering the Court's question, as well as the series of misconduct as described above, the Court finds that the sanction meets the standard for the exclusion of evidence and was appropriate under the circumstances. Accordingly, HUD's motion to reconsider the Court's imposition of the sanction is denied.

### 2. *Excluded for the reasons set forth in Joliet's motion in limine*

In addition to the sanction against HUD, the Court excluded the testimony of Caplinger and the 2013 REAC inspections as to all Defendants—including HUD—for the reasons set forth in Joliet's motion in limine. Defendants continue to argue in support of the relevance of the 2013 inspections, and maintain that any inconsistencies that arise should go to the weight that the Court gives to the inspections, not their admissibility. The primary concern of Joliet and the Court, however, was the reliability of the evidence and the allegation that it was manufactured for purposes of litigation, as opposed to conducted in the routine course of business. It was, therefore, an issue of admissibility, not of weight.

Defendants offered the 2013 REAC inspections into evidence as business records of HUD pursuant to Federal Rule of Evidence 803(6). "The business-records exception removes

22

the hearsay bar for records kept in the course of a regularly conducted business activity if making the records is a regular practice of that business activity, so long as 'neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.'" Jordan v. Binns, 712 F.3d 1123, 1135 (7th Cir. 2013) (quoting Fed. R. Evid. 803(6)). "It is well established, though, that documents prepared in anticipation of litigation are not admissible under [Rule] 803(6)." Id. at 1135-1136 (collecting cases).

HUD has consistently argued that the routine nature and trustworthiness of the 2013 inspections can be proven through the testimony of the inspector, Caplinger, who would allegedly say that she conducted the inspections of ET I and II in the same manner that she has conducted all REAC inspections. In so arguing, however, Defendants fail to address the larger concern with respect to who ordered the inspection and the motives beyond such a request. Indeed, the Seventh Circuit has held that "[t]he primary motive for commissioning reports . . . is a better indicator of trustworthiness than the form of the investigation or the identity of the investigator." Id. at 1136 (internal quotation marks and citation omitted).

The motives behind the commission and execution of the 2013 REAC inspections— which resulted in passing scores for the property—are of particular concern in this case where, among other things: (1) the inspections occurred approximately five months after the final appeal of the 2012 inspections, which resulted in a failing score for the property with exigent health and safety concerns noted; (2) the inspections were ordered at or around the same time as the abrupt disclosure of the 2012 inspections, and occurred only one month later; and (3) the inspections were ordered at the same time as the examination of Hinsberger who was testifying as to his participation in having the 2012 inspections declared out of standard and removed from the REAC computer system. In order to determine the admissibility of the inspection reports as a

business record, in light of the aforementioned circumstances, the Court asked HUD, as an initial matter, who ordered the inspections. HUD failed to provide the Court with an answer to this question until its instant motion to reconsider. The evidence before the Court at the time of its ruling and the arguments made by Joliet in its motion in limine called into question the trustworthiness and routineness of the 2013 inspections, and supported the contention that the inspections were ordered and conducted for purposes of litigation. As a result of HUD's reticence, there was no evidence to the contrary. Thus, "[i]n finding this report inadmissible under Rule 803(6), [the Court] adhere[ed] to the well-established rule that documents made in anticipation of litigation are inadmissible under the business records exception." United States v. Blackburn, 992 F.2d 666, 670 (7th Cir. 1993).

Since the Court's ruling and during the briefing of the instant motions, HUD has proffered various declarations to support Defendants' argument that the 2013 inspections were routine and trustworthy—including the alleged identity of the person who ordered the inspection. While new to the Court, the information provided in these declarations is not newly discovered by HUD, and therefore not a proper basis upon which to reconsider the Court's ruling.

In any event, the declarations of Delton Nichols ("Nichols"), Michele Schmidt ("Schmidt"), Kimberlee Scoles ("Scoles"), and Caplinger—as a whole—do not alleviate the Court's concern that "neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6). As an initial matter, the Court recognizes that the declarations of Caplinger, who carried out the inspection, and Scoles, who conducted various reviews of the inspections, state that the inspections and reviews were done routinely and without influence or interference from anyone else. Nevertheless, as described above, the Court is also concerned with the "primary motive for commissioning [the]

24

reports" in order to determine whether they are trustworthy as a business record, not only how the inspections were ultimately carried out. Jordan, 712 F.3d at 1136.

Nichols, the Deputy Director of REAC, states that "[r]equests [for inspections] routinely come either through personal contact or through an automated scheduling system." Decl. of Delton Nichols ¶ 4. According to Nichols, in late February or early March of 2013, Hinsberger called him and requested inspections for ET I and II. Nichols then contacted Schmidt, who was responsible for scheduling the quality assurance inspections, and asked her to schedule physical inspections for ET I and II. Schmidt proceeded to contact Tina Merit at ET I and II to schedule the inspections. Schmidt states that on March 19, 2013, she had coordinated the available dates with the property owners and scheduled the inspections for April 23-25, 2013. She assigned Dilio Patel ("Patel"), a quality assurance inspector out of Atlanta, Georgia, to conduct the inspections.

According to Schmidt's declaration, however, on April 11, 2013 she "learned that a travel money emergency would make funding for Quality Assurance inspections extremely limited and would require cancelation or postponement of many scheduled Quality Assurance inspections." Decl. Michele Schmidt ¶ 6. Schmidt noted that Patel would have to fly from Atlanta to Chicago in order to conduct the inspections. "Therefore, on approximately April 16, [she] reassigned the scheduled Quality Assurance inspections to Rhonda Caplinger, another Quality Assurance inspector, who is based in southern Indiana and was available to conduct the inspections without incurring airfare expenses." Id. The second declaration of Caplinger, however, provides a slightly different course of events.

According to Caplinger, in November of 2012, she was contacted by a REAC official in Washington, D.C. who asked her to perform a demonstrative inspection of Evergreen Terrace in

Joliet, Illinois. Due to scheduling conflicts, however, Caplinger was unable to perform the inspections. Approximately three or four months later, she was contacted by HUD attorneys to turn over any emails or materials that she had relating to ET I and II. She states, "I understood that the request was connected with pending litigation but I did not know anything about the substance of the litigation." Second Decl. of Rhonda Caplinger ¶ 6.

Caplinger further provides that one month later, she learned that REAC had experienced cutbacks in its travel budget. She also noticed that Patel was assigned to travel from Atlanta to Chicago to conduct inspections of ET I and II—although she did not "realize that this was the same property that [she] had been previously contacted about." Id. ¶ 7. Accordingly, Caplinger explains that, in order to "save HUD money because [she] could drive to Joliet, while the other inspector would have to fly to Chicago," she volunteered to conduct the inspection herself. Id. Caplinger contacted the travel manager with her offer, the travel manager then contacted Schmidt, and Schmidt then reassigned Caplinger to conduct the April 2013 inspections.

The discrepancies between Schmidt's and Caplinger's descriptions of how the inspections of ET I and II came to be reassigned to Caplinger are questionable—particularly considering the identity of Caplinger, who happens to be the inspector who was previously asked to do a demonstrative inspection of the property. Furthermore, it appears to be anything but routine for an inspector to volunteer to perform an inspection of a property currently under litigation when another inspector has already been assigned the task. The Court notes that, although Caplinger saved HUD the expense of a plane ticket, she too incurred hotel expenses, as well as the cost of driving approximately 400 miles roundtrip from Indianapolis to Joliet.

In addition, the timing of Hinsberger's request to have the property inspected remains suspect. The inspections could have been ordered at any time following the appeals of the 2012

inspections in November of 2012; however, Hinsberger made the request to REAC at approximately the same time as he began his testimony in this trial and the attorneys for HUD disclosed the 2012 REAC inspections to Joliet and the Court. These questions raised by the declarations submitted by HUD in its instant motion do not support the trustworthiness of the inspections or of the motives behind their inception. Although REAC inspections are routinely performed by HUD, in this instance, the inspections appear to be anything but routine. Therefore, excluding the inspections as an inadmissible business record of HUD—as to all parties—does not constitute a manifest error of law. Accordingly, Defendants' motions to reconsider the Court's ruling excluding the 2013 inspections and the testimony of Rhonda Caplinger are denied.

### III. CONCLUSION

For the foregoing reasons, Defendants' Rule 59(e) motions are denied.

IT IS SO ORDERED.

ENTER:

CHARLES RONALD NORGLE, Judge
United States District Court

DATE: October 24, 2013