## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| CITY OF JOLIET, an Illinois Municipal Corporation, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| MID-CITY NATIONAL BANK OF CHICAGO, et al, | ) ) ) |
| Defendants. | ) ) |

No. 05 CV 6746

Hon. Charles R. Norgle

### OPINION AND ORDER

This eminent domain and Fair Housing Act ("FHA"), 42 U.S.C. § 3601, *et seq.*, action

between Plaintiff City of Joliet ("Joliet" or the "City") and Defendants New West, L.P., New

Bluff, L.P., *et al.* (collectively, "New West/New Bluff")[1] began in 2005. The matter was

removed to this Court on November 29, 2005. Following seven years of extensive litigation,

including appeals to the Seventh Circuit and an unsuccessful petition for *writ of certiorari* before

the United States Supreme Court, this case proceeded to bench trial on September 27, 2012. The

bench trial lasted approximately one hundred days—spanning over 19,000 pages of transcripts—

and concluded on May 21, 2014, when the Court heard the parties' closing arguments. The

parties submitted their proposed findings of fact and conclusions of law pursuant to the Local

---

[1] Defendants New West/New Bluff include the following: Mid-City National Bank of Chicago (n/k/a MB Financial Bank, N.A.) as Successor Trustee to United of America Bank, Trustee under Trust Agreement Dated 5/9/1980 and known as Trust No. 1252; the Beneficiaries under Trust No. 1252; Burnham Management Company; Burnham Residential Venture I, Corp.; Burnham Residential I, L.P.; New West, an Illinois Limited Partnership; New Bluff, and Illinois Limited Partnership; Mid-City National Bank of Chicago (n/k/a MB Financial Bank, N.A.), as Successor Trustee to United of America Bank, Trustee under Trust No. 1335; the Beneficiaries under Trust No. 1335; Burnham Residential Venture VII, L.P.; Burnham Residential Venture VII, Corp.; Ralph W. Gidwitz; and Ronald J. Gidwitz. These defendants are for-profit entities and individual investors who, among other things, receive tax benefits related to their structure and enterprises.

Rule Guidelines for Proposed Findings of Fact and Conclusions of Law, which the Court has considered together with witness testimony, and trial exhibits that were introduced into evidence. The Court declines to admit any and all evidence made by way of offers of proof which was submitted after the close of evidence at trial and which was previously rejected by the Court. The following constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a). For the reasons set forth below, the Court finds in favor of Joliet and against New West/New Bluff on all claims.

## I. FINDINGS OF FACT

### A. The Parties

This action arises out of Joliet's efforts to acquire the properties known as Evergreen Terrace I ("ET I") and Evergreen Terrace II ("ET II") (collectively, "ET" or the "property") by exercising its power of eminent domain. ET is a 356-unit apartment complex subsidized by the federal government under the United States Housing Act of 1937 ("Section 8"). It is owned by New West/New Bluff, subject to mortgages held by the United States Department of Housing and Urban Development ("HUD").

#### *1. Plaintiff City of Joliet*

Joliet is an Illinois municipal corporation organized and existing under the laws of the State of Illinois, including, *inter alia*, the Illinois Municipal Code, 65 Ill. Comp. Stat. 5/1-1-1 *et seq.*, and other applicable statutes of the State of Illinois. It is located approximately forty miles southwest of Chicago in an area referred to by the United States Census Bureau as the "Chicago-Joliet-Naperville Metropolitan Area." Joliet is located primarily in Will County, Illinois, but a small portion of its western border is in Kendall County. Downtown Joliet is located along the east side of the Des Plaines River, adjacent to ET, which is located on the west side of the river.

Joliet is a home rule unit of local government. See Ill. Const., art. VII, § 6. The Joliet city council is comprised of five district council members, three at-large council members, and the mayor, who is also elected at-large. Joliet also has a city manager who is appointed to oversee day-to-day operations of the City. On October 4, 2005, the city council unanimously passed Ordinance No. 15298, authorizing the condemnation of ET I and ET II in order to eradicate what the City found to be blight at the property and to extend a pre-existing city park known as the Riverwalk through the property along the Des Plaines River. Three days later, on October 7, 2005, Joliet filed the instant eminent domain action in the Circuit Court of Will County, Illinois against the record owners of ET, New West/New Bluff. Shortly thereafter, on November 29, 2005, the case was removed to this Court.

### 2. *Defendants*

#### a. *New West/New Bluff*

New West Limited Partnership ("New West") is an Illinois limited partnership and, at all times relevant to this action, has been the beneficiary of Mid-City National Bank of Chicago (n/k/a/ MB Financial Bank, N.A.) Trust No. 1252, which is the land trust that owns the real estate and property commonly known as ET I. New West was formed in 1980 to purchase and own ET I. One percent of New West is owned by general partners, which are Burnham Residential Venture I, L.P. and Burnham Residential Venture I Corp. These entities are controlled by Ronald Gidwitz and his cousin Ralph Gidwitz, who are limited partners and shareholders. The remaining ninety-nine percent of New West is owned by limited partners who are comprised of approximately thirty to forty individuals and trusts—many of whom include members of the Gidwitz family. The Gidwitz family real estate interests are managed by Ronald Gidwitz.

3

New Bluff Limited Partnership ("New Bluff") is an Illinois limited partnership and, at all times relevant to this action, has been the beneficiary of Mid-City National Bank of Chicago (n/k/a MB Financial Bank N.A.) Trust No. 1335, which is the land trust that owns the real estate and property commonly known as ET II. New Bluff was formed in 1982 for the purpose of purchasing and owning ET II. The general partners of New Bluff, Burnham Residential Venture VII, L.P. and Burnham Residential Venture VII, Corp., own one percent of the interests in New Bluff. These entities are controlled by Ralph and Ronald Gidwitz, who are limited partners and shareholders. As with New West, the remaining ninety-nine percent of New Bluff is owned by limited partners who consist of a combination of individuals and trusts, including numerous members of the Gidwitz family.

Burnham Management Company ("Burnham") is an Illinois corporation which is owned by eight members of the Gidwitz family, including Ronald Gidwitz.[2] HUD considers Burnham to be an identity-of-interest management company because of the overlap in the ownership of ET's management company and the owners of the property—namely, the Gidwitz family. Since the early 1980's, Burnham has served as the property manager for ET I and ET II. Burnham is also the property manager for five other project-based Section 8 properties, in addition to other commercial and residential properties throughout the Chicago metropolitan area that are owned by the Gidwitz family interests. Of the five other Section 8 properties managed by Burnham, three provide housing for elderly and disabled residents and contain forty-three, fifty-two, and 100 units, respectively. The remaining two provide housing for families, one of which contains twenty-seven units, and the other which contains ninety-nine units. Even combined, these five other Section 8 properties managed by Burnham contain less than the 356 units at ET. Each

---

[2] The seven other Gidwitz family members include Ronald's siblings: James, Peter, Thomas, and Nancy; and their cousins: Ralph, Alan (now deceased), and Betsy.

4

year, Burnham is paid approximately $300,000 for the management of ET, which is greater than the management fees that it collects on all of its other properties.

Jake Paschen ("Paschen") has been the president of Burnham since 2010, and he attended almost every day of the lengthy trial as the corporate representative of New West/New Bluff. Paschen reports directly to the general partners of New West/New Bluff. Prior to 2010, Herbert Halperin ("Halperin") had been the president of Burnham for approximately twenty years. New West/New Bluff are the only remaining defendants in this condemnation action. They have raised affirmative defenses pursuant to the FHA to oppose Joliet's attempts to condemn the property, arguing that Joliet acted with a discriminatory intent or effect through its use of eminent domain.

### b. *HUD*

On March 9, 2006, the Court granted New West/New Bluff's motion to join HUD as a necessary party pursuant to Federal Rule of Civil Procedure 19(a). HUD holds mortgage and reversionary interests in ET I and ET II by virtue of two mortgages and incorporated regulatory agreements, which were recorded by the Will County, Illinois Recorder of Deeds on November 6, 2006. These agreements, in conjunction with several federal statutes and regulations, govern the operation of ET. During HUD's tenure in this lawsuit, it opposed Joliet's attempt to acquire the property by, *inter alia*, raising FHA defenses. On November 12, 2013, HUD was dismissed from this action pursuant to a settlement agreement entered into between the federal government, HUD and Joliet. The comprehensive HUD settlement agreement was entered into evidence during the bench trial.

### c. *The Named-Tenants*

On January 31, 2008, the Court granted a motion to intervene brought by several low-income tenants who resided at ET pursuant to leases and benefited from federal Section 8 subsidies provided for their units. Some of the original named-tenants withdrew during the pendency of the lawsuit and were replaced by other tenants of ET. At the time of trial, there were four named-tenant defendants: Teresa Davis, Elvis Foster, Arnetris Renee Griffin, and Alfreda Eubanks. Of the four named-tenants, only Teresa Davis and Elvis Foster had been residents of ET since the beginning of the lawsuit in 2005. Like New West/New Bluff and HUD, the named-tenants opposed Joliet's eminent domain action and raised affirmative defenses pursuant to the FHA. On January 10, 2014, the Court entered an agreed order of dismissal pursuant to a settlement agreement between Joliet and the named-tenants, wherein Teresa Davis, Elvis Foster, Arnetris Renee Griffin, and Alfreda Eubanks were dismissed from this action with prejudice.

### B. The Property

ET consists of eight buildings on approximately 9.5 acres of land located on the west side of the Des Plaines River in Joliet, Illinois. ET I is currently comprised of four residential buildings, one administrative office building, and a guard building known as the "welcome center" that is staffed by security officers. Those buildings are located at 350, 358, 362, 363, and 366 North Broadway Street. ET II consists of three residential buildings located at 300, 301, 311, and 316 North Bluff Street.

As recipients of Section 8 project-based assistance, HUD requires New West/New Bluff to limit admission at ET to only low-income families. Thus, all tenants of ET must qualify under HUD's definition for "low income," "very low income," or "extremely low income." 24 C.F.R.

6

§§ 5.603, 5.653. Pursuant to the HUD program, no less than forty percent of the units at ET must be available for extremely low-income families. 24 C.F.R. § 5.653(c).

For more than a decade, ninety percent of the tenants living at ET have been, and are, young, female, African-American heads-of-households with children. There is no evidence that New West/New Bluff have ever marketed the property in such a way as to achieve a less racially segregated resident population. At any given time, there are between 400 and 600 children living at ET I and ET II. At present, there are approximately 780 residents listed on lease agreements as tenants of ET. The property is currently at a ninety-nine percent occupancy level, and has a lengthy waiting list for prospective low-income tenants. Notwithstanding the high occupancy level, the property has a tenant-turnover rate of approximately twenty-five percent each year.

The property was originally constructed in the late 1960's and operated for ten years as a low-income subsidized housing project. By the mid to late-1970's however, the original owners defaulted on their mortgage and the property went into foreclosure. The original owners identified the following problems that led to their ultimate failure with the project: crime, a high number of calls to the police and fire departments, vandalism, a related difficulty in attracting lease compliant tenants, their acceptance of any tenants in an effort to maintain occupancy, code violations, a lack of building maintenance and deferred maintenance, inadequate management and security, and excessive density. Pl.'s Ex. 90, at pp. 3-11; see also Trial Tr. vol. 2, 207, 233, City of Joliet v. Mid-City Nat'l Bank of Chi., No. 05-6746 (N.D. Ill. Oct. 4, 2013) (testimony of John Mezera). The City then solicited proposals for redevelopment of the project for use as, among other things, elderly and low-income housing.

On May 29, 1979, Joliet selected Burnham Development Company to acquire, redevelop, and manage the property. Shortly thereafter, New West and New Bluff were formed to purchase the property. HUD sold the two pieces of the property to New West/New Bluff for $1 each. New West/New Bluff then obtained $14 million from HUD to repair and rehabilitate the property, which would be developed into the two phases now known as ET I and ET II. During this time, Joliet granted all permits and zoning variances necessary for the redevelopment. While Joliet approved the plans for the existing building and unit sizes, at the time, the City believed that New West/New Bluff intended to redevelop the project as mixed-use housing for senior citizens, and moderate to low-income families—not solely for use as housing for low-income families with children. This intended mixed-use, with a majority of the units to be designated for elderly housing, was consistent with the Regulatory Use Agreements and Housing Assistance Payment ("HAP") Agreements that New West/New Bluff entered into with HUD.

The agreements with HUD provided for forty-year mortgages on ET I and ET II, as well as twenty-year HAP contracts. Under these agreements, New West/New Bluff received above-market rents for the units from HUD. Specifically, HUD paid New West/New Bluff monthly assistance payments, which was the difference between the contract rent contained in the HAP agreements and the tenant's share of the contract rent for a unit, based upon the tenant's income, among other criteria. Because of the extremely low income of many tenants at ET, a large number of tenants pay nothing for their units and the entire rent is subsidized by HUD. Under the HAP agreements, New West/New Bluff are required to maintain the property in a safe, decent, and sanitary condition.

HUD serves as the HAP contract administrator for ET I, while Joliet served as the HAP contract administrator for ET II from 1982 to 2007. HUD issued the HAP contract assistance

payments for ET II to Joliet, who would then distribute the money to New Bluff. As contract administrator for ET II, Joliet was required to inspect the units at ET II on an annual basis and identify violations that needed to be corrected. Joliet would then certify to HUD that the units had been inspected and that the payments made to New Bluff were in accordance with HUD's regulations and requirements. Irrespective of these yearly certifications, Joliet communicated its concerns to both HUD and New West/New Bluff as to the numerous code violations at ET I and ET II, and ET II's failure to meet HUD's standards. Indeed, even HUD, as contract administrator for ET I, continued to provide funds when it knew that the entire property was in violation of its standards, having failed its Real Estate Assessment Center ("REAC") inspections in numerous years, including 2002, 2003, and 2012.[3] HUD REAC conducts physical inspections of properties subsidized by HUD to ensure that families have housing that is decent, safe, sanitary, and in good repair.

**C. Exercise of the Power of Eminent Domain by the Joliet City Council**

> *1. Joliet's Discussions with HUD and New West/New Bluff During the Mark-to-Market Process Prior to Exercise of Eminent Domain*

In early 2000, Joliet became aware that New West/New Bluff's contracts with HUD for ET were set to expire in 2002 and 2003. During this time period, Joliet's then-city manager, John Mezera ("Mezera") met with New West/New Bluff to discuss a possible sale of the property to Joliet. Upon discovering that New West/New Bluff were unwilling to sell the property for less than $5 million in excess of their existing mortgages on ET, Joliet ended negotiations.

Shortly thereafter, in 2001 and 2003, New West/New Bluff applied for a restructuring of their debt on ET and for an extension of the Section 8 contracts with HUD under HUD's Mark-

---

[3] HUD did not conduct REAC inspections from 2005 through 2011 while renovations were ongoing.

to-Market ("M2M") program. M2M was created to carry out Congress' objectives pursuant to the Multifamily Assisted Housing Reform and Affordability Act of 1997, 42 U.S.C. § 1437f ("MAHRAA"). Among other things, MAHRAA provides for the reduction of rents subsidized by the federal government at project-based Section 8 housing when their contract terms expire. Under MAHRAA and M2M, the debts on Section 8 properties are to be restructured in order for projects to remain viable even with lowered rent subsidies paid to the owners. However, certain Section 8 properties, like ET, are incapable of operating on market-rate rents because the properties have an increased risk of defaulting on their debts and going into foreclosure, thereby increasing the FHA's insurance claims. Thus, under M2M, HUD has authority to use exception rents, which are above comparable market rents, in order to preserve certain projects. With respect to ET, New West/New Bluff and HUD agreed that the property could not be sustained on market-rate rents and would still require rent subsidies at above-market rates or exception rents in order to stay operable.

HUD manages the M2M program by using Participating Administrative Entities ("PAE") that provide evaluations and assessments of a property prior to determining whether it qualifies for M2M restructuring. HUD originally appointed the Illinois Housing Development Authority ("IHDA") as the PAE for ET I. Later, Heskin-Signet was appointed as the PAE for both ET I and ET II.

Joliet was considered a stakeholder in the M2M process, and as such, both HUD and the PAE solicited Joliet's input and consulted with the City during the restructuring process. To the extent that New West/New Bluff argue that Joliet attempted to "block" restructuring, the Court rejects that proposed finding as unsupported by the evidence. Although a stakeholder in the

process, Joliet did not have the power to approve or prevent restructuring—that power belonged solely to HUD.

From the beginning of the process in 2002, up until the adoption of the eminent domain ordinance in 2005, Joliet made it known to HUD and the various PAE's that it opposed the restructuring of ET's contracts and mortgages. Joliet maintained that the proposed restructuring would be, and is, inadequate to address blight at the property due to, among other things, structural problems with the buildings, crime, and functional obsolescence. Joliet's position, as a stakeholder in the process, was that the property should be redeveloped into mixed-income housing or subsidized housing, only if it could be done in such a way as to avoid the reoccurrence of the problems that the property has continuously experienced in the past. Joliet consistently expressed its concern regarding the longstanding problems that it experienced with ET and the effects that it had on the surrounding area. Joliet also provided HUD with numerous plans for redevelopment of the property into a mixed-income community, which had been accomplished with projects in other cities all over the country, including in Chicago. See Order, Aug. 8, 2013 (Doc. No. 772) (taking judicial notice of facts concerning the relocation of the approximately 25,000 residents of the former Robert Taylor Homes public housing project in Chicago following its demolition and redevelopment). Indeed, HUD specifically requested redevelopment plans from the City to address the potential relocation of ET's tenants in the event that the property was redeveloped.

On March 28, 2003, IHDA submitted a M2M restructuring plan to HUD with respect to ET I, despite Joliet's objections. On May 16, 2003, HUD accepted the plan and initially moved forward by issuing a M2M restructuring commitment to New West for ET I. Before learning that IHDA's plan had been approved, Joliet expressed its opinion that the plan was completely

inadequate and did not sufficiently address the large amount of repairs needed, nor did it appropriately provide for the cost of operating the property, including security and maintenance. HUD later agreed with Joliet and abandoned IHDA's restructuring plan. HUD eventually appointed a new PAE, Heskin-Signet, for ET to provide a more realistic restructuring plan.

On July 16, 2003, HUD met with Joliet to discuss the problems at ET and the issues that the City had with the deficiencies in IHDA's restructuring plan. During this meeting, HUD discussed the variety of options available to Joliet with respect to the property, including: (1) purchasing ET from New West/New Bluff and opting out of the HAP contracts, which would result in the issuance of HUD Section 8 Housing Choice Vouchers to the residents;[4] (2) exercising its right of eminent domain to acquire ET; or (3) finding a third party or non-profit entity to acquire ET from New West/New Bluff.

In September of 2003, Joliet once again met with HUD officials, including then-Secretary of HUD, Mel Martinez, to discuss ET. At that time, HUD officials indicated that they would stop the IHDA restructuring from going forward if they were legally able to do so. However, because HUD had already issued a restructuring commitment to New West months earlier for ET I, it determined that it was legally obligated to go forward with a restructuring. Recognizing the deficiencies in IHDA's plan, HUD assigned Heskin-Signet to redo a due-diligence examination of the property and to address more of the physical and operational problems.

By July of 2005, Charles Williams of HUD called Mezera, Joliet's then-city manager, to inform the City that Heskin-Signet's M2M restructuring plan was going to be approved. On July 13, 2005, a letter was sent to then-Secretary of HUD, Alphonso Jackson, from Illinois Senators Barack Obama and Richard Durbin and Congressman Jerry Weller, the representative of the

---

[4] Unlike project-based Section 8 assistance which remains with a specific unit, HUD Section 8 Housing Choice Vouchers are issued to qualifying individuals who can take the vouchers and move anywhere they choose into a unit where a landlord accepts such vouchers and that meets HUD's approval.

district in which Joliet is located. The letter provided, *inter alia,* "We know that [HUD] is currently considering [M2M] designation for [ET]. We believe that designation would reward current management with an undeserved opportunity to retain management control. We ask that you meet with us to discuss and reconsider that designation." Pl.'s Ex. 577. Shortly thereafter, then-Senator Obama, Congressman Weller, and representatives sent on behalf of Senator Durbin met in Washington, D.C. with HUD officials, including Charles Williams and then-Secretary Alphonso Jackson. At the meeting, the participants discussed the options that Joliet had in light of the M2M restructuring plan that had been accepted—namely, that Joliet could allow the restructuring to go forward, acquire ET through eminent domain, purchase ET from New West/New Bluff, or find a third-party to purchase the property from New West/New Bluff.

On August 11, 2005, Senators Obama and Durbin and Congressman Weller sent a letter to Joliet's then-mayor, Art Schultz, informing him that they had met with HUD and were told that HUD considered itself legally bound to go forward with the M2M for ET, and would do so by the end of the month if Joliet did not present another viable alternative, *i.e.,* an offer by the City or other third-party to purchase the property, or the City's exercise of eminent domain. HUD official Charles Williams testified that on August 11, 2005, a conference call was held between Joliet, HUD, and Congressman Weller's officer as a follow-up to the meeting held in Washington, D.C. The information exchanged in this meeting was memorialized in a letter written by Joliet city manager, Mezera, to Williams, dated August 12, 2005. The letter stated that the parties once again discussed the three options available to Joliet in light of HUD's intention to move forward with the restructuring, and that HUD indicated that if Joliet condemned the property, HUD would provide Housing Choice Vouchers or portable vouchers to

all eligible ET residents.[5] After eliminating all other options, Joliet initiated steps to take the property by eminent domain.

### 2. *Joliet's Initiation of Eminent Domain Procedures*

On August 17, 2005, the Joliet city council passed Resolution No. 5655 with respect to ET, which declared that it was authorized and appropriate for the City to use its eminent domain authority to eliminate the blighted conditions existing at Evergreen Terrace. Pl.'s Ex. 2. Among other things, Resolution No. 5655 provides the following:

> WHEREAS, the buildings, improvements and grounds of the real property commonly known as [ET I and ET II] have become extremely dilapidated, unsafe and dangerous, unsanitary, crime-infested and a substantial threat to the health, safety and welfare of the residents of [ET] and their families and guests; and
>
> WHEREAS, the conditions at [ET] unreasonably interfere with the lawful use of nearby private and public properties, divert important public resources such as police protection, fire protection and emergency medical services, impair the orderly development of nearby properties, depress property values, increase the cost of public services and adversely affect the tax base of the City, local schools and other public agencies; and
>
> WHEREAS, the City Manager, the Police Chief, the Fire Chief, the Director of Community and Economic Development, the Director of Inspection Services and other City officials have inspected [ET] and nearby properties and have prepared reports documenting the deplorable conditions existing at and near the property; and
>
> WHEREAS, based on the foregoing, the Mayor and City Council hereby find and declare that [ET] is unsafe and dangerous, a public nuisance and a blighted area . . . .

Id. The city council further found that in order to abate the public nuisance and eliminate the blight at ET, the City would need to acquire the property through purchase, condemnation, or otherwise. Id. Following this action by the city council, on September 1, 2005, Senators Obama and Durbin and Congressman Weller sent another letter to the Secretary of HUD, informing him that Joliet had initiated eminent domain proceedings for ET, which was one of the options that

---

[5] Pursuant to the settlement agreement entered into between Joliet and HUD, HUD has agreed to provide Housing Choice Section 8 vouchers to eligible residents of ET in the event that Joliet obtains the property.

14

had been discussed in meetings with HUD. The letter also requested additional time for Joliet to negotiate a purchase with the owners or to file its eminent domain case.

On August 26, 2005, just over one week after the city council passed Resolution No. 5655, New West/New Bluff sent Joliet a non-binding summary of key terms for the purchase of ET. In the summary, New West/New Bluff proposed a purchase price of $24 million. Pl.'s Exs. 243-244. This proposed price was more than double the amount of the existing mortgages on the property at the time, which amounted to over $10 million. While New West/New Bluff did not submit an accompanying appraisal along with their proposed demand, appraisals of ET conducted by HUD less than a year earlier in November of 2004 indicated a value of $3.327 million for ET I and $1.92 million for ET II, for a total value of $5.247 million for the property.

Meanwhile, Joliet obtained its own appraisal of ET in order to make a good faith offer of purchase to New West/New Bluff. This appraisal, however, was not included with the eventual offer made to New West/New Bluff. On or about September 21, 2005, Joliet submitted its offer of $7.1 million for ET I and $3.6 million for ET II, for a total of $10.7 million for the property to New West/New Bluff, free and clear of all HUD interests. Although this offer exceeded Joliet's appraised value of the property, it was rejected by New West/New Bluff because it was less than the amount of the remaining mortgages on the property and thus insufficient to compensate the owners. After the City's good faith offer of purchase was rejected, the City proceeded with eminent domain.

In the interim, HUD issued a new M2M restructuring commitment for ET I based on the Heskin-Signet plan in September of 2005. On October 24, 2005, HUD issued a M2M restructuring commitment for ET II based on the Heskin-Signet plan, which was fully executed

15

on November 11, 2005. The financing for the restructuring and maintenance of ET I and ET II, however, was not completed for another year.

In September of 2006, HUD issued amended M2M restructuring commitments to New West/New Bluff so that the restructuring transactions for ET could proceed without a private or third party lender providing the first mortgages. Pursuant to the amended restructuring commitments, there would be two closings each for ET I and ET II—the first consisting of direct loans from HUD sufficient to pay off the existing mortgages, and the second to be reserved for after the culmination of the instant condemnation proceeding to consist of first mortgages on the property from private or third party lenders, insured by HUD.

As part of the new M2M plan, HUD required New West/New Bluff to provide $1,553,671.69 of their own money up front to help finance the renovations. HUD promised to repay this money to New West/New Bluff plus interest at a rate of 7.5%.[6] The first phase of the closings for ET I and ET II occurred on November 4, 2006, when the M2M and HAP contracts were finalized, and became effective on December 1, 2006. The approved maintenance and repairs for ET did not begin until January of 2007 and were not completed until April of 2012. Throughout this time period, HUD maintained oversight and guidance of the process through frequent telephone conferences with New West/New Bluff.

### 3. Eminent Domain Ordinance and Lawsuit

On October 4, 2005, Joliet's mayor and city council unanimously adopted Ordinance No. 15298, authorizing the acquisition of ET through eminent domain. Among other things, the ordinance provides:

> WHEREAS, the buildings, structures, improvements and grounds of [ET] . . . are extremely dilapidated, unsafe and dangerous, substandard, unsanitary,

---

[6] The Court notes that HUD loaned money to New West/New Bluff at a significantly less favorable interest rate of only 1%.

crime-infested and a substantial threat to the health, safety and welfare of its residents, their families and guests, the owners and occupants of nearby properties and to the general public; and

WHEREAS, [ET] is a "blighted or slum area" within the meaning of Section 11-11-1 of the Illinois Municipal Code in that it is an area exceeding two acres and a detriment to public safety by reason of dilapidation, overcrowding, faulty arrangement or design, lack of ventilation, light or sanitation facilities and deleterious land uses; and

WHEREAS, [ET] is also blighted by substandard buildings or structures within the meaning of Section 11-13-17 of the Illinois Municipal Code; and

WHEREAS, the conditions at [ET] unreasonably interfere with the lawful use of nearby private properties, schools and public parks, divert important public resources such as police protection, fire protection and emergency medical services, impair the orderly development of nearby properties, depress property values, increase the cost of public services and adversely affect the tax base of the City, local schools and other public agencies; and

WHEREAS, the City manager, the Police Chief, the Fire Chief, the Director of Community and Economic Development, the Director of Inspection Services and other City officials have inspected [ET] and nearby properties and have reported to the Mayor and City Council the deplorable, unlawful and unsafe conditions existing at and near [ET]; and

WHEREAS, the blighted, unsafe and dangerous substandard condition of [ET] is chronic and has persisted for decades despite substantial financial investment; and . . . .
. . . .

WHEREAS, the Mayor and City Council find that the abatement of these conditions, the elimination of the blight and the rehabilitation and redevelopment of the area requires that the City of Joliet acquire fee simple title to the Subject Property; and . . . .
. . . .

WHEREAS, the Mayor and City Council further declare that it is in the public interest that the redevelopment of the Subject Property include affordable housing and other compatible residential land uses; and

WHEREAS, the Mayor and City Council further declare that it is in the public interest that the redevelopment of [ET] include a public park and recreational facility to be owned or controlled by the City of Joliet and available for use by the residents of the Subject Property and the general public; and . . . .
. . . .

WHEREAS, the proposed redevelopment of the Subject Property is consistent with previous plans approved by the Mayor and City Council; and

WHEREAS, the Subject Property is designated as an integrated project for rehabilitation and redevelopment; and

WHEREAS, the Mayor and City Council find and determine that the acquisition of the property interests described herein is necessary, convenient, useful, advantageous and desirable for municipal purposes or public welfare . . . .

Pl.'s Ex. 1. At the time that the Ordinance was passed, the City had no formal or specific plans to support its purported redevelopment of ET. Now, Joliet's proposed redevelopment is guided by the settlement agreement with HUD. In addition, Joliet has retained a management and development company, Holsten Real Estate Development Corporation and Holsten Management Corporation, to prepare a development plan for the property and act as the property manager in the event that the City acquires ET.

Three days after the Ordinance was passed, on October 7, 2005, Joliet filed the instant eminent domain action in the Circuit Court of Will County. On or about this same time, Joliet filed and recorded a *lis pendens* against ET in the Will County Recorder's office. The *lis pendens* provides constructive notice of the pending condemnation litigation to those who might acquire an interest in the property. The Court rejects New West/New Bluff's argument and proposed findings that the mere filing of the *lis pendens* somehow delayed the M2M restructuring and repairs. There is simply no evidence that the City filed the *lis pendens* to purposefully delay funding in any way. The Court draws no negative inference from the filing of the *lis pendens*. The *lis pendens* filed by the City was routine and, in accordance with Illinois law governing the matter, 735 Ill. Comp. Stat. 5/2-1901.

## D. Joliet's Public Purpose to Acquire ET through Eminent Domain in 2005

The trial in this case was held to determine, *inter alia*, (1) whether Joliet had a valid public purpose to use its power of eminent domain to acquire the property in 2005, and (2) whether that public purpose still exists now, or at the time of the taking. The Court makes the following factual findings.

With respect to the public purpose in 2005, the Court finds as follows. On October 4, 2005, through the enactment of Ordinance No. 15298, Joliet declared that it had two public

purposes for which to use its power of eminent domain to acquire ET—first, to eliminate blight, and second, to extend the Riverwalk, a public park. Although a legislative determination of blight is presumed to be for a public purpose under the governing Illinois statute, 735 Ill. Comp. Stat. 30/5-5-5(c), New West/New Bluff nevertheless argue that Joliet lacks a public purpose because the property was not blighted in 2005 and the City's finding to the contrary was merely a pretext for racial discrimination. The Court rejects New West/New Bluff's challenge as to the existence of blight at ET in 2005 and earlier. From 2000 to 2005, Joliet's Building Services Division, Neighborhood Services Division, Fire Department, and Police Department reported numerous serious and ongoing health, safety, and quality of life hazards at ET. The results of those inspections and the blighted condition of the property were further corroborated by HUD REAC inspections conducted at the time, witness testimony, and other evidence presented at trial. The weight of the evidence supports the factual finding that ET was blighted in 2005.

### *1. 2003 and 2005 Building Services and Fire Department Inspections of ET*

The Court hereby incorporates by reference and accepts as findings of fact Joliet's Proposed Findings of Fact numbers 53 to 70, which detail the recurring violations at ET found during Joliet's Building Services Division and Joliet's Fire Department 2003 and 2005 inspections, as well as the hazards these violations posed to the residents of ET. These findings include the following: dysfunctional and missing emergency and hallway lighting; broken exit signs; inoperable elevators; damaged and missing pull box covers on fire alarm stations; defective fire doors incapable of self-closing and positive latching; exterior doors incapable of closing; unsanitary stairwells due to urine and smell of urine; inoperable smoke detectors; decrepit parking lots; broken, damaged, or missing windows and window screens; non-operating fire/smoke doors in hallways and stairwells; non-operating fire doors to garbage chutes; damaged

and inoperative fire standpipe systems and connections; missing portable fire extinguishers; structural instability of exterior brick walls; extensive rust and corrosion to exit stairwells; non-addressable fire alarm system; no proof of last fire sprinkler, standpipe system or fire pump test; aged and decrepit building facades with loose or missing bricks; damaged doors; missing, broken, and loose electrical outlets and/or lighting fixtures; damaged walls and floors; urine in interior common spaces; and improperly stored fire safety equipment. The conditions present during the 2003 and 2005 Building Services Division and Fire Department inspections were dangerous and posed a significant danger to the residents at ET and contribute to the overall finding of blight present at ET in 2005.

### 2. 2003 and 2005 Neighborhood Services Inspections

The Court hereby incorporates by reference and accepts as findings of fact Joliet's Proposed Findings of Fact numbers 71 to 79, which detail the recurring violations at ET found by Joliet's Neighborhood Services Division following inspections performed in 2003 and 2005 of the tenant living units at the property. Leading up to the 2005 condemnation, Joliet's Neighborhood Services Division reported a number of serious and recurring health and quality of life violations within the living units at ET, including the following: unit overcrowding; roach infestation; leaking plumbing; defective or missing window screens; broken windows or window panes; missing electrical outlet covers; mold; defective and damaged doors; defective or damaged kitchen cabinetry; damaged walls and ceilings; decrepit parking lots; damaged air conditioning units; defective or missing fire extinguishers; defective or missing smoke detectors; defective electrical outlets; water damage; poorly maintained exterior common areas; damaged exterior lights; broken exit lights; damaged brick and mortar work; exterior doors left propped open; exterior garbage cans overflowing; and an overwhelming smell of urine in the stairwells

20

and hallways. These recurring and un-remedied deplorable conditions contribute to the overall finding of blight in 2005.

### *3. Police Department Reports from 2000 to 2005*

The Court hereby incorporates by reference and accepts as findings of fact Joliet's Proposed Findings of Fact numbers 80 to 98, which detail problems with crime experienced at the property, including the large numbers of calls for service to ET by the Joliet Police Department and specific reports of crimes and incidents at ET from 2000 to 2005.

For example, in 2000, Joliet police responded to 1,514 calls for service at ET, which averaged over four calls for service per day to ET. In 2001, Joliet police responded to 1,662 calls for service at ET, which averaged over four calls for service per day to ET. In 2002, Joliet police responded to 1,953 calls for service at ET, which averaged over five calls for service per day to ET. In 2003, Joliet police responded to 1,790 calls for service at ET, which averaged nearly five calls for service per day to ET. In 2004, Joliet police responded to 1,747 calls for service at ET, which averaged nearly five calls for service per day to ET. From 2000 to 2004, the Joliet Police Department responded to an average of 4.75 calls for service a day at ET. The need for constant police responses at the property during this time was costly to the City. In 2001, the City spent over $735,000 in police services for ET alone. Although New West/New Bluff paid approximately one third of that particular bill, the evidence shows that in the years leading up to condemnation, the owners failed to pay Joliet for the off-duty police officers that provided security at ET.

Furthermore, from 2000 to 2004, there were a total of 3,404 reported crimes at ET, including 250 that were classified as violent—which amount to an average of 1.86 reported crimes occurring daily at ET during this time period. An additional 640 reported crimes

occurred at ET in 2005. The record also includes evidence of specific crimes, such as an incident that occurred in June of 2005 where ET management was notified by ET residents that the maintenance employees were selling drugs at the property and that the maintenance staff also gave drug dealers keys to vacant apartments to store and sell drugs. This evidence of repeated crime and excessive calls for service from 2000 to 2005 further supports the finding of blight at ET in 2005.

### 4. Reports from HUD, New West/New Bluff, the Tenants of ET and Governmental Representatives that Support the Finding of Blight in 2005

The Court hereby incorporates by reference and accepts as findings of fact Joliet's Proposed Findings of Fact numbers 99 to 105, which provide evidence of the horrid conditions at ET in 2005 from the perspective of HUD, New West/New Bluff, the tenants, and other political and government figures. Specifically, the documents and statements describe the vast amount of problems, repairs, and maintenance that had been deferred—despite the immediate need for corrections—including issues with rodent infestations and a complete lack of security. These various statements and documents from HUD, the tenants, governmental leaders, and New West/New Bluff all corroborate the finding that ET was blighted in 2005.

### 5. HUD REAC Inspections Conducted Between 1999 and 2005 Corroborate Joliet's Inspections

The Court hereby incorporates by reference and accepts as findings of fact Joliet's Proposed Findings of Fact numbers 106 to 110, which detail the results of failed REAC inspections conducted by HUD at ET from 1999 to 2005. Specifically, ET I and ET II were inspected annually by HUD REAC from 1999 to 2005. Many of those inspections resulted in failing numerical scores of well below 60, and every inspection disclosed exigent health, safety,

22

and fire deficiencies at the property.[7] For example, in 1999, ET I received a REAC score of 50c*, and ET II received a 51b*; in 2000, ET I received a score of 75c, and ET II received a 63b; in 2001, ET I received a score of 79c*, and ET II received a 72b*; in 2002, ET I received a score of 56c*, and ET II received a 42c*; in 2003, ET I received a 25c*, and ET II received a 47c; in 2004, ET I received a 60c*, and ET II received a 76c; and in 2005, ET I received a 61c*, and ET II received a 62c*. While a REAC score of below 60 does not equate to a designation of blight on the property, it is nevertheless relevant to the determination of whether a property is blighted. These REAC scores leading up to the City's exercise of eminent domain support a finding of blight at ET in 2005.

### 6. ET Was Functionally Obsolete and Ill-Suited to Its Use in 2005

The Court hereby incorporates by reference and accepts as findings of fact Joliet's Proposed Findings of Fact numbers 111 to 131, which detail how ET was functionally obsolete and ill-suited to its use as a multi-family residence in 2005—particularly one which houses at least 780 residents, with young families. ET I contains seven studio apartments, 126 one-bedroom apartments, 106 two-bedroom apartments, and two three-bedroom apartments; and ET II contains sixteen studio apartments, fifty-two one-bedroom apartments, thirty-six two-bedroom

---

[7] A property's final REAC score can range from 0 to 100 points. Any score of 60 points or below is a failing score. HUD considers a property with a failing score to be in default of its contractual obligations with HUD and to be failing to provide residents "decent, safe, sanitary housing in good repair." See Trial Tr. vol. 41, 6852, City of Joliet v. Mid-City Nat'l Bank of Chi., No. 05-6746 (N.D. Ill. Mar. 18, 2013) (testimony of Hinsberger). A property's numerical score is accompanied by an alphabetical annotation to highlight the serious nature of cited exigent health and safety violations. See HUD Ex. 330, at pp. 4171–4173. Scores annotated with an "a" signify that no health and safety deficiencies aside from smoke detectors were observed. Id. Scores annotated with a "b" indicate that one or more non-life threatening health and safety violations other than smoke detector deficiencies were observed, but no exigent/fire safety deficiencies were observed. Id. Scores annotated with a "c" indicate that one or more exigent/fire health and safety deficiencies were observed. Id. Scores further annotated with an asterisk (*) indicate that smoke detector deficiencies were observed. Id.

23

apartments, and eleven three-bedroom apartments. Many large families are living in apartments much too small for their needs.

Furthermore, even though anywhere from 400 to 600 children live at ET at any given time, the property had only one playground in 2005, which was built and maintained by the educational non-profit group Catholic Charities' Head Start program, not New West/New Bluff. After the M2M renovations in 2012, a new playground was installed, but it is still grossly insufficient and ill-equipped to provide recreation and enjoyment for the number of children of various age groups who reside at the property. The new playground also fails to provide a safe environment, as it is located outside of the security gates and fencing that surround ET I and contain the "welcome center" guard house.

Additionally, the elevators at the 358 N. Broadway Street, 363 N. Broadway Street, and 366 N. Broadway Street buildings were completely inoperable for nine years, from 2003 to April of 2012. The property suffered, and continues to suffer, from faulty design and arrangement for its current resident population.

### *7. Joliet Had a Good Faith Basis to Believe that Eminent Domain Was Necessary to Cure the Blighted Conditions at the Property*

The Court hereby incorporates by reference and accepts as findings of fact Joliet's Proposed Findings of Fact numbers 132 to 199, which outline a history of problems at ET, problems with management, issues with deferred maintenance, and the insufficiencies of the M2M plans—all of which lead to the Court's conclusion that the City had a good faith basis to believe that the only way to cure the blight in 2005 was to take the property by eminent domain.

Despite improvements and repairs that have been made over the history of the property, it continues to fall into the same cycle of disrepair. For example, during trial, following the viewing of a video tape of a 1989 inspection and a 1994 inspection of ET, the Court entered

24

findings that the conditions depicted in the inspection videos were clearly and obviously dangerous, and that the hallways were dark, unlit, and without windows. Indeed, New West/New Bluff admitted that the conditions depicted in the 1994 video were not appropriate for a family living facility. Although approximately $750,000 to $1,000,000 was spent on repairs following the 1994 inspections, ET once again fell into disrepair by the late 1990's and the early 2000's. When owner, Ronald Gidwitz, was asked why New West/New Bluff did not spend any money on security, repairs, and improvements at the property until receiving money from HUD, he testified that it would not be a good business risk. He said that investing the money necessary to maintain and improve ET would be equivalent to a charitable donation, and if the owners had wanted to make charitable donations, there were better options. See Trial Tr. vol. 95, 15619, 15642, City of Joliet v. Mid-City Nat'l Bank of Chi., No. 05-6746 (N.D. Ill. Dec. 16, 2013) (Testimony of Ronald Gidwitz); Trial Tr. vol. 23, 3575, City of Joliet v. Mid-City Nat'l Bank of Chi., No. 05-6746 (N.D. Ill. Dec. 19, 2012) (testimony of Paschen). Lastly, the fact that HUD ultimately approved M2M restructuring for ET does not in any way affect Joliet's legislative determination that the property was blighted in 2005. The Court rejects New West/New Bluff's argument that Joliet's actions in pursuing eminent domain were irrational and pretextual. In sum, the Court finds that ET I and ET II were blighted in 2005, and therefore Joliet had a valid public purpose to exercise its power of eminent domain at the time of the ordinance.

## *8. Joliet's Additional Public Purpose to Condemn the Property for Use as a Public Park*

In addition to arguing that Joliet's 2005 finding of blight was a pretext for racial discrimination, New West/New Bluff also argue that Joliet's other public purpose—the extension of a public park—is pretextual because the City did not have a good faith basis to assert this purported public purpose; and thus, Joliet acted arbitrarily in passing the ordinance authorizing

25

eminent domain. The Court rejects this argument. The evidence presented at trial shows that Joliet had plans to obtain the portion of the property along the riverfront to use for the extension of Bicentennial Park since 1990. This intention was further reiterated during the initial discussions of the M2M process with HUD. The construction and expansion of the Riverwalk was part of a long term development plan of the City. Therefore, Joliet's assertion in its eminent domain ordinance that the property would be taken, in part, for the creation a public park is not pretextual; rather, the Court finds that it is a good faith, and non-arbitrary public use.

## E. Public Purpose to Acquire the Property at the Time of the Taking

Due to the passage of time from the enactment of the ordinance in 2005 and the taking, the Court ruled that the present condition of the property is also relevant. Specifically, New West/New Bluff bear the burden to show by clear and convincing evidence that the blighted conditions at ET have been eradicated. See Norfolk Redev. & Hous. Auth. v. C & C Real Estate, Inc., 630 S.E.2d 505, 509-510 (Va. 2006). For the following reasons, the Court finds that New West/New Bluff have failed to meet their burden, and that blight at ET has not been eradicated, despite the expenditure of $5 million in federal funds during 2007 through 2012 to repair and rehabilitate the property.

### 1. Failed 2012 REAC Inspections

The Court hereby incorporates by reference and accepts as findings of fact Joliet's Proposed Findings of Fact numbers 207 to 217, which provide the results and circumstances surrounding the 2012 failed REAC inspections at ET I and ET II, all of which were later officially discarded by HUD under highly unusual circumstances. See Opinion & Order, Oct. 24, 2013 [Doc. No. 824] (providing further details regarding the failed 2012 REAC inspections and their untimely disclosure and noting that the Court found that Hinsberger's testimony on the

26

matter was not credible). On May 17 and May 18, 2012, a HUD REAC inspection of ET I took place. Following this inspection, ET I received a failing score of 57c*, with the "c" indicating the presence of serious exigent health and safety violations. For the reasons discussed in the aforementioned incorporated findings of fact, HUD removed or purged these inspection results, without disclosing them to the City or the Court. The May 2012 REAC inspection of ET II was canceled.

New 2012 REAC inspections were scheduled for the property for July of 2012. At the July 2012 inspection, ET I scored a 46c*, significantly lower than its May 2012 score. New West appealed the results of this inspection, but ET I still received a failing score. ET II was inspected by REAC on July 18 and July 19, 2012. ET II received a failing score of 50c*. As a result of these failing scores, on October 11, 2012, HUD sent New West/New Bluff (1) notices of violation of HUD's Regulatory Agreements for ET I and ET II, and (2) a notice of default of the HAP contract for ET I. Some of the deficiencies from ET I reported in the notice of default included: hazardous sharp edges; ground erosion; overgrown and penetrating vegetation; parking lots, driveways and roads had settlement and heaving; retaining walls were damaged, falling, and leaning; obstructed or missing accessibility routes; the foundations had spalling and exposed rebar; doors had damaged hardware and locks; outlets and switches were missing and had broken cover plates; windows were missing and had deteriorated caulking, seals, and glazing compounds; inoperable HVAC; bathrooms had leaking plumbing, faucets, and pipes; insect infestations; inoperable kitchen refrigerators; electrical hazards with exposed wire and open panels; inoperable smoke detectors; mold and mildew; inoperable ground fault interrupters or GFI;[8] inoperable emergency and fire exits; and missing exit signs. See HUD Ex. 486.

---

[8] GFI are designed to prevent electrical shocks by tripping circuit breakers when a certain amount of electrical current is detected. See Anderson v. P.A. Radocy & Sons, Inc., 67 F.3d 619, 620 n.1 (7th Cir.

On November 2, 2012, notwithstanding the fact that ET was officially in default with HUD based upon the failed July inspections, New West/New Bluff disingenuously and outrageously created a video—starring, among other people, Burnham President and New West/New Bluff's corporate representative, Paschen—which purported to show that ET I and ET II were decent, safe, sanitary, and in good repair. This video was made during trial at the request of New West/New Bluff's attorneys, with the support of HUD's attorneys, and without Joliet's knowledge. Shortly after the video's creation, Paschen testified regarding its substance, lauding the conditions of the property, without mentioning that the property was in default, and that it been found to be indecent, unsafe, unsanitary, and not in good repair after it had failed three different REAC inspections in 2012. On November 21, 2012, however, the notice of default and notices of violations were withdrawn and the July 2012 REAC inspection results were once again removed or purged by HUD for reasons unexplained.

The Court finds that the property was not decent, safe, sanitary, or in good repair following $5 million in repairs and renovations, in the midst of the current litigation, and with plenty of notice to New West/New Bluff; this fact supports the finding that blight at the property has not been eradicated as of 2012 or later.

### 2. The Refinancing and Repairs Did Not Eradicate the Blight at ET

The Court hereby incorporates by reference and accepts as findings of fact Joliet's Proposed Findings of Fact numbers 218 to 232, which detail some of the recurring problems at ET in the years following the filing of the instant eminent domain lawsuit in 2005, including the time after the M2M repairs and rehabilitation were completed. The evidence shows that mold in the units has remained a problem, as well as pervasive German cockroach and Norwegian rat

1995) ("A GFI is a device which shuts off electricity when it senses an imbalance in the circuit caused by leakage to ground.").

infestations. Notably, Smithereens, a new exterminator, had to be hired because the former exterminator could not handle the magnitude of the infestations at the property.

From 2007 to 2012, the following repairs, replacements, and improvements were made at ET using the $5 million in M2M funds: capital improvements, upgrades and repairs to the interior and exterior of the buildings, including the replacement of the elevators in ET I; a new state-of-the-art security system; new exterior fencing, landscaping and lighting; tuck-pointing and other façade work; extensive unit renovations of the kitchens and bathrooms; the construction of a guard building known as the welcome center, which is staffed around the clock by a security company; a commercial-grade children's playground; and a new storm sewer system for ET I and replacement of its parking lot. See New West/New Bluff Ex. 413. Also, every resident of ET who is above the age of 18 years possesses a key card that contains the resident's picture and unit information. The key card allows access into the building where he or she resides. Resident access is restricted. Guests must register and are banned at the discretion of management.

These repairs and improvements, however, have proven insufficient to eliminate blight at the property. For example, with respect to the new state-of-the-art security system, ET management received reports of camera's being stolen, and at one point Property Manager Danny Davis suggested that they needed cameras watching the cameras. The new fencing at the property only surrounds ET I, leaving ET II and the surrounding areas, including the new playground, completely unprotected. Similarly, the welcome center guard building is positioned at the opening in the fencing only around ET I. In addition, New West/New Bluff have already had to change security companies because the employees could not handle the work at ET. Specifically, security guards were being threatened and harassed, including a pregnant security

29

officer, and residents reported that the security staff members are too afraid to confront people who enter the property. In one instance in 2010, shots were fired from a BB gun into the guard building, shattering a glass window, which took over a year to replace. There have also been reports of people paying residents to obtain visitor passes for them. Criminal suspects have been found on the property who were not residents and who did not have a visitor pass.

It is undisputed that New West/New Bluff have made capital improvements with the money from the M2M restructuring, but the historical evidence shows that they are unable to maintain the property even following mass improvements and renovations. New West/New Bluff's policy of deferred maintenance simply does not work for a property that has proven to be in need of constant maintenance and repairs. Deferred maintenance only allows the problems to compound, as they have done in the past. The evidence shows that New West/New Bluff have been unable to provide a permanent remedy to the many problems at ET and eradicate blight in their more than thirty years of ownership, despite periodic infusions of cash from HUD.

### 3. High Crime Rates and High Calls for Service

The Court hereby incorporates by reference and accepts as findings of fact Joliet's Proposed Findings of Fact numbers 233 to 260, which provide the high rates of arrests, criminal incidents, and calls for service, as well as the details of specific crimes reported in the years following the filing of the eminent domain lawsuit from 2006 to 2011. These facts lead to a finding that blight has not been eradicated at the time of the taking.

The total number of reported incidents at ET between 2006 and 2009 was 2,444; or an average of 611 incidents per year and 1.67 reported incidents per day. The number of criminal incidents and arrests occurring at ET remained high, even after new security measures were put into place using M2M funds. For example, although the welcome center guard house was

operational in January of 2009, the Joliet Police Department reported 270 arrests made at the property that year, and 371 arrests according to the defendant's own expert witness, Merrick Bobb. And at a time when Joliet experienced a reduction in the number of arrests city-wide from 2008 to 2011, ET still had 293 reported arrests in 2010 and 223 in 2011.

With respect to calls for service, New West/New Bluff do not contest the exceedingly large number of calls—an average of 4.68 per day in 2006 through 2009. As with the high number of calls for service pre-2005, however, New West/New Bluff argue that calls for service are not good indicators of a crime rate, but rather are used to measure the activity of officers at specific times and places. Even so, because police, fire, and medical emergency personnel have to respond to so many calls for service from the property, the high numbers of calls for service indicate how many of the City's resources are expended at ET—which houses only a fraction of Joliet's population. This continued diversion of "important public resources such as police protection, fire protection, and emergency medical services" is precisely one of the reasons for which Joliet found the property to be blighted in 2005. Pl.'s Ex. 1.

Additionally, New West/New Bluff contend that, although crime is experienced at the property, ownership and management have procedures in place to deal with the incidents and to try to prevent further occurrences. These procedures include background checks on applicants before allowing them to move into the property, the installation of security cameras, contracts with security services and the Joliet Police Department for patrol of the property, and the banning or eviction of any resident or visitor engaged in criminal activity. As in the past, however, these measures have proven insufficient. There are numerous reports that the security staff are too afraid to deal with loiterers and those who commit crime on the property. Further, security guards have had their lives threatened on multiple occasions. While certain visitors are

placed on a list of people banned from the property or from receiving a visitor pass, there have still been incidents where such people otherwise gain access and have been found on the property. Although New West/New Bluff claim that all tenants involved in criminal activity are evicted, there has been specific evidence to the contrary. In January of 2011, former named-tenant defendant and member of ET's Resident Council, Elvis Foster, was caught with a screwdriver and a drill attempting to break into a unit in the 358 N. Broadway St. building, but he was not evicted for the incident. See Pl.'s Ex. 659. According to the evidence presented at trial, the new security measures have been unable to sufficiently abate criminal activity at the property.

HUD's expert witness, Susan Connor ("Connor"), testified that the occurrence of crimes, even multiple crimes, does not alone lead to a finding of blight. The level of criminal activity at ET, however, is significant, and rises above the level of multiple isolated incidents of crime. In any event, the occurrence of crimes is not the only evidence of blight. As discussed above, the Court finds that blight has not been eradicated at ET based upon multiple factors, which includes the high rate of criminal activity and the large numbers of calls for service. Although Connor testified that, in her opinion, she did not believe that any individual inspection, infestation, safety violation, or crime lead to a finding of blight in 2005 or at any time thereafter, the Court is not basing its finding on an individual incident. Rather, the Court finds that the property was blighted, and continues to be blighted based on all of the evidence discussed above. Indeed, it is the severity and extensive number of health and safety problems at ET in the aggregate that support the Court's finding of blight.

Lastly, the Court notes that all of the failed inspections, safety violations, unsanitary conditions, and criminal activity at ET post-2005 occurred during the pendency of this litigation,

and under the watchful eye of HUD—at a time when management and ownership put forth their best efforts to maintain the property. The evidence shows that even New West/New Bluff's best efforts have failed to make a meaningful difference to eradicate blight at the property. For all of these reasons, New West/New Bluff failed to prove by clear and convincing evidence that blight has been eradicated at ET I and ET II.

## F. No Evidence that Joliet Acted With An Intent to Discriminate Against African-Americans

The Court hereby incorporates by reference and accepts as findings of fact Joliet's Proposed Findings of Fact numbers 261 to 300, which show that the record contains no credible evidence that Joliet acted pretextually or with an intent to discriminate on the basis of race. Indeed, as discussed above, Joliet sets forth valid and legitimate public purposes for its use of eminent domain—namely that the property was and is blighted, and that the City wants to extend the Riverwalk public park. The eminent domain ordinance passed by Joliet's city council is not facially discriminatory. Nevertheless, New West/New Bluff argue that they have presented circumstantial evidence of Joliet's discriminatory intent. Specifically, New West/New Bluff argue that (1) Joliet lacks a public purpose for eminent domain; (2) the effect of eminent domain would be to make housing or subsidized housing in Joliet unavailable to African-Americans and perpetuate segregation; and (3) former Joliet city councilman Timothy Brophy ("Brophy") allegedly referred to the residents of ET as "rats."

First, as stated above, the Court finds that Joliet had, and continues to have, a valid public purpose to use its power of eminent domain.

Second, there is no evidence that Joliet intended to condemn the property in order to make housing, particularly subsidized housing, unavailable to African-Americans. New West/New Bluff seek to equate the Housing Authority of Joliet's (the "HAJ") actions of

33

demolishing other public housing in Joliet to that of the City of Joliet. The Court rejects these arguments. The HAJ serves all of Will County, Illinois, not just Joliet. Joliet and the HAJ are completely separate entities. And, the HAJ is not a party to the instant lawsuit. Furthermore, in demolishing the public housing complex in Joliet known as Poole Gardens, the HAJ acted with the express approval of HUD. Moreover, no subsidized housing was lost in that action because the 106 units at Poole Gardens were replaced with 106 Housing Choice Vouchers and 148 subsidized units in the newly constructed Liberty Meadows housing project.

Similarly, the City did not condemn ET with the intent to discriminate by limiting the number of subsidized housing units available to African-Americans because the evidence shows that there will be no such effect from a successful taking. Pursuant to the HUD settlement, the 356 units at ET will be replaced with at least 115 subsidized units at the redeveloped property, and the remaining units will be replaced with Housing Choice Vouchers that the voucher-holders can use to rent housing in Joliet or elsewhere should they so choose. Specifically, the HUD settlement agreement provides the following: (1) unless approved by HUD and replaced elsewhere in Joliet, at least 115 units subsidized under the terms of the existing HAP contracts, which will be transferred to Joliet or a Joliet-controlled entity, will remain on the property, Pl.'s Ex. 1133 ¶¶ 39-40; (2) HUD will issue additional vouchers to replace each unit removed from the site, and the residents of those units will receive the vouchers to use for relocation, id. at ¶ 40; (3) Joliet will provide all tenants who are relocated due to the redevelopment of the property and reduction of units at least one year for relocation, and will pay relocation costs, id.; and (4) if a resident who has been issued a voucher and identifies that he or she wishes to remain in Joliet or Will County cannot find a unit affordable with the issued voucher, Joliet shall identify a unit that meets HUD requirements or maintain additional units on the property sufficient to cover each

34

such resident. Id. New West/New Bluff argue that residents will be unable to find housing with vouchers. The evidence, however, does not support this mere assertion. Although Joliet has only 22% of the population of Will County, a majority of the county's voucher holders reside in Joliet—which indicates that housing for voucher holders is available in Joliet.

Furthermore, the plan contained within the HUD settlement agreement is not substantially different from those plans put forth by Joliet starting in 2002 around the beginning of the M2M process. For example, in 2002, Joliet proposed a phased relocation of the residents of ET over a multi-year period using: vouchers, available public housing in the City, and various subsidized home ownership programs. The proposal also recognized the need for relocation assistance to be provided to the residents, just as in the HUD settlement. Joliet's 2003 and 2005 redevelopment plan, referred to as the Program of Choice, is practically identical to the terms of the HUD settlement agreement. That Joliet has maintained substantially the same plans throughout this process, suggests that the City never intended to discriminate or eliminate subsidized housing by redeveloping ET.

In addition, the demographic statistics presented by the parties is conclusive evidence that Joliet does not intend to discriminate against African-Americans by eliminating "the only housing available to them" in the City. The portion of Joliet and the census tract which contains ET is neither predominantly white, nor predominantly upper income. In 2010, the population of Joliet Township, where ET is located, was 45% non-Hispanic white, 35% Hispanic, and 24% African-American.[9] Also, the minority population in the entire City increased from 2000 to 2010, further discrediting New West/New Bluff's argument that Joliet was trying to make housing unavailable to African-Americans or to minorities in general during this time period.

_____

[9] According to 2010 census data, Joliet's population as a whole was 53% non-Hispanic white, 15.6% non-Hispanic African-American, 27.8% Hispanic, and 1.9% non-Hispanic Asian.

With respect to New West/New Bluff's allegations that Joliet somehow seeks to create a segregated population on the west side of the river by condemning the property, the Court notes that ET itself could not be more segregated than it is in its current state, with a resident population that is over ninety-five percent African-American. Accordingly, the evidence shows that the City never intended to discriminate against African-Americans by eliminating housing and subsidized housing available to them.

Lastly, New West/New Bluff argue that the alleged comments of former Joliet city councilman Brophy are evidence that Joliet acted with an intent to discriminate in pursuing eminent domain for ET. Brophy's first allegedly discriminatory comment occurred during a meeting with HUD in the fall of 1999. No notes were taken at this meeting and there is no record supporting what was discussed. Only one witness, the discredited Hinsberger of HUD, recalled that Brophy stated that all of the residents from ET were from Chicago and that he wanted to send the "rats" back to Chicago. Trial Tr., vol. 39, 6556, 6571-73, City of Joliet v. Mid-City Nat'l Bank of Chi., No. 05-6746 (N.D. Ill. Mar. 13, 2013) (testimony of Hinsberger). The second alleged Brophy-comment occurred during another meeting with Joliet, HUD, and IHDA on July 16, 2003. Once again, no notes from this meeting were produced, and there are no other documents supporting that the discussion took place. None of the witnesses who testified regarding the comments—Hinsberger, Harry West, and Beverly Bishop of HUD, and Marie Gottschlich of IHDA—could recall much about the meeting that occurred ten years earlier. The witnesses agreed, however, that Brophy made a comment about Chicago tearing down its public housing and that the people from the Chicago Public Housing or "rats" came to Joliet to live at ET. At worst, this isolated evidence shows that Brophy had a negative attitude toward people from Chicago or residents from Chicago Public Housing in 1999 and 2003. Accepting that

36

Brophy's comments were racially motivated, of which there is sparse evidence, the personal opinions of a single city councilman uttered years before Joliet enacted its eminent domain ordinance to condemn ET, cannot be attributed to the City as a whole or its legislative actions. The overwhelming evidence supports the fact that all other representatives of Joliet, including the city manager and fire and police departments, repeatedly discussed in good faith the extensive crime and fire safety problems at ET, the blight, the functional obsolescence, and the options that the City had with respect to the property, including eminent domain. There is simply no evidence to support New West/New Bluff's argument that Joliet intended to discriminate on the basis of race through the use of its power of eminent domain.

## G. No Evidence of a Discriminatory Effect Due to Joliet's Use of Eminent Domain

The Court hereby incorporates by reference and accepts as findings of fact Joliet's Proposed Findings of Fact numbers 301 to 335, which provide that there is no evidence that that Joliet's use of eminent domain will have a discriminatory effect or disparate impact on African-Americans. In support of their argument that Joliet's condemnation of ET would have a discriminatory effect or disparate impact, New West/New Bluff rely largely on the testimony and reports of their expert witness, Calvin Bradford ("Bradford"), who is a sociologist with experience in the use of statistics, and Andrew Beveridge ("Beveridge"), who is a sociologist called by HUD as an expert in disparate impact. Both experts testified that there is a correlation between race and income level in Joliet and Will County. They also testified that, in 2010, there was a higher percentage of low income African-American households in Joliet and Will County than low income white households. For instance, in 2010 in Joliet, fifteen percent of African-American households made less than $10,000, while only three percent of white households made less than $10,000. Thus, the experts concluded that because there are more low income

African-American households than low income white households in the area, any reduction in the number of subsidized housing available would have a disparate impact on African-Americans. Beveridge did an additional analysis based solely on the racial make-up of ET. Beveridge testified that 3.2 percent of all African-Americans in Joliet live at ET, and only .029 percent of all whites in Joliet live at ET, which results in a ratio of 92:1. He then concluded that, because more African-Americans live at ET than whites, the removal of any units at ET would have a disparate impact on African-Americans.

Neither expert was asked to do an analysis regarding the potential removal of subsidized units and the replacement thereof with new units or vouchers. And neither expert took into account other minority groups in the area, particularly the large Hispanic population in both Joliet and Will County. Notably, based on the statistics, the experts testified that the disparate impact would be the same whether the City's policy led to the loss of one unit at ET or all 365.

With respect to the residents who will be relocating with vouchers, there is no evidence that they will be unable to use the vouchers in a reasonable geographical proximity to ET should they so choose—which includes Joliet, Will County, and the Chicago-Joliet-Naperville Metropolitan area. The defendants failed to present any reliable evidence that housing could not be found in those areas for up to 241 new voucher holders. Although the expert witnesses testified as to a shortage in subsidized housing, they admitted that a general shortage of tenant-based and voucher subsidies exists in the entire United States, not just Joliet. Furthermore, the settlement agreement with HUD specifically provides that if a resident wants to stay in Joliet or Will County, but is unable to find a unit, the City will increase the number of subsidized units available at the redeveloped property accordingly.

Because the Court finds, pursuant to the HUD settlement, that all units at ET will be replaced with either new units in the redeveloped property or housing choice vouchers, the experts' conclusions relying solely on the loss of subsidized units are largely irrelevant. Importantly, both experts conceded, and the Court agrees, that if the vouchers are issued and can be used in a reasonable geographic area, of which there is no credible evidence to the contrary, there is no disparate impact that will affect the residents of ET.

## II. CONCLUSIONS OF LAW

### A. Jurisdiction

The Seventh Circuit previously found that "the presence of the national government [HUD] as a party with a security interest in the real estate [ET] supplies [subject matter] jurisdiction" in this case. City of Joliet v. New West, L.P., 562 F.3d 830, 833 (7th Cir. 2009). Specifically, jurisdiction is found pursuant to 28 U.S.C. §§ 1444, 2410, which allow, *inter alia*, the federal government to be named in an action to condemn "real or personal property on which the United States has or claims a mortgage or other lien." 28 U.S.C. § 2410(a). Although HUD is no longer a party in this litigation, the Court retains supplemental jurisdiction over the remaining parties and claims pursuant to 28 U.S.C. § 1367(a). See also Pac. Mut. Life Ins. Co. v. Am. Nat'l Bank & Trust Co. of Chi., 642 F. Supp. 163, 165 (N.D. Ill. 1986) (finding that pendant party jurisdiction would apply for other parties in a foreclosure suit against the federal government under 28 U.S.C. §§ 1340, 2410); HSBC Bank USA, N.A. v. Garcia, No. 12 CV 6561, 2014 U.S. Dist. LEXIS 108541, at *10 (N.D. Ill. Aug. 6, 2014) ("[T]he court has subject-matter jurisdiction over HSBC's claim against the United States pursuant to 28 U.S.C. § 1331, and has supplemental jurisdiction over the remaining claims [and parties] under 28 U.S.C. § 1367(a).")

**B. Joliet Properly Exercised Its Right of Eminent Domain to Acquire the Property**

### 1. *Governing Law*

Illinois state law governs the eminent domain proceedings in this action. In 2007, Illinois revised its eminent domain statute and enacted the current version, the Eminent Domain Act, 735 Ill. Comp. Stat. 30/1-1-1, et seq. (the "2007 Act"), effective January 1, 2007. The 2007 Act applies "to complaints to condemn that are filed on or after its effective date." 735 Ill. Comp. Stat. 30/90-5-5. Joliet filed its Second Amended Complaint on March 9, 2012 (Doc. No. 324), and thus, the 2007 Act applies here. In addition to the 2007 Act, the Court applies provisions of the Illinois Municipal Code relating to the City's power of eminent domain. The issues of whether Joliet has a valid public purpose and whether Joliet's purpose of blight is a pretext for racial discrimination, however, are governed by controlling federal constitutional and statutory law, including the FHA.

### 2. *Public Use*

The Fifth Amendment to the United States Constitution limits the exercise of the government's eminent domain powers by requiring the taking to be for "public use" and that just compensation be paid to the property owner. Brown v. Legal Found. of Wash., 538 U.S. 216, 231 (2003). It is well established that the government is not permitted to take property under the mere pretext of a public purpose. Kelo v. City of New London, Conn., 545 U.S. 469, 478 (2005). A taking of private property will only satisfy the U.S. Constitution's public use requirement if it serves a legitimate public purpose within the government's authority. See id. at 479.

Illinois law limits the government's power of eminent domain by requiring a condemning authority to act in strict conformance with the statutes granting it such power. See, e.g., People

ex rel. Dir. of Fin. Young Women's Christian Ass'n of Springfield, 427 N.E.2d 70, 76 (Ill. 1981); Vill. of Cary v. Trout Valley Ass'n, 667 N.E.2d 1082, 1088 (Ill. App. Ct. 1996); Vill. of Skokie v. Gianoulis, 632 N.E.2d 106, 111 (Ill. App. Ct. 1994). The 2007 Act expressly provides that it shall be strictly construed as a limitation on the government's exercise of eminent domain. 735 Ill. Comp. Stat. 30/90-5-15. Section 5-5-5(a) of the 2007 Act states, "[i]n addition to all other limitations and requirements, a condemning authority may not take or damage property by the exercise of the power of eminent domain unless it is for a public use, as set forth in this Section." 735 Ill. Comp. Stat. 30/5-5-5(a). The acquisition of property by eminent domain for a "public use" is an exercise of the legislative power and reaches to the full extent of the sovereign's police power. See City of Joliet v. New West, No. 05 C 6746, 2012 WL 5463792, at *5 (N.D. Ill. Nov. 5, 2012) (quoting Hawaii Hous. Auth. v. Midkiff, 467 U.S. 229, 239-40 (1984)). The Supreme Court has long interpreted "public use" to mean "public purpose." Id. (citing Kelo, 545 U.S. at 480).

As applicable here, the 2007 Act provides: "If the exercise of eminent domain authority is to acquire property for public ownership and control, then the condemning authority must prove that (i) the acquisition of the property is necessary for a public purpose and (ii) the acquired property will be owned and controlled by the condemning authority or another governmental entity." 735 Ill. Comp. Stat. 30/5-5-5(b). Pursuant to the terms of the settlement between HUD and Joliet, if the City is successful in the taking, it will retain ownership and control over the property. As to a public purpose, the evidence shows that Joliet's taking of ET serves two legitimate public uses: the eradication of blight and the extension of a park. It has long been recognized that the eradication of blight serves as a valid public purpose and is a legitimate use of a municipality's eminent domain power. Zurn v. City of Chi., 59 N.E.2d 18, 25

41

(Ill. 1945) (holding that the taking of private property for the purpose of eliminating blight meets all the requirements of a public use and public purpose within the principles of the law of eminent domain); see also Berman v. Parker, 348 U.S. 26 (1954). There is no dispute that, on its face, the eradication of blight constitutes a valid public purpose. It is also well established that the taking of private property for use as a park is a valid public purpose under Illinois law. See Vill. of Depue v. Banschbach, 113 N.E. 156, 158 (Ill. 1916). Additionally, as the Seventh Circuit stated, "[i]f Joliet thinks that a given parcel of land should be put to a public use, such as a park, and is willing to foot the bill, it is hard to see any obstacle in federal law." New West, L.P. v. City of Joliet, 491 F.3d 717, 721 (7th Cir. 2007).

### *3. Eminent Domain Action Authorized by Applicable Statutes*

Illinois law requires a condemning body to negotiate in good faith with the property owner over the amount of compensation to be paid as a "condition precedent" to initiating eminent domain proceedings. Forest Pres. Dist. of DuPage Cnty. v. First Nat'l Bank of Franklin Park, 961 N.E.2d 775, 792 (Ill. 2011) (citing Dep't of Transp. ex rel. People v. 151 Interstate Road Corp., 810 N.E.2d 1, 7 (Ill. 2004)); see 735 Ill. Comp. Stat. 30/10-5-10(a). Here, Joliet negotiated in good faith with New West/New Bluff when it offered $10.7 million for the property on or about September 21, 2005. New West/New Bluff rejected this offer, having previously demanded over $20 million for ET. New West/New Bluff stated that they would not accept less than the amount of the existing mortgages, which exceeded the appraised values of the property at the time. Leaving no further room for negotiation, Joliet properly initiated eminent domain proceedings.

42

A municipality's power to condemn is conferred by a specific legislative enactment. City of Batavia v. Sandberg, 677 N.E.2d 1010, 1013 (Ill. App. Ct. 1997). Joliet has exercised its power of eminent domain under the following sections of the Illinois municipal code:

1. Section 11-61-1 of the Illinois Municipal Code, 65 Ill. Comp. Stat. 5/11-61-1, permits the City to exercise the right of eminent domain to acquire real property useful, advantageous or desirable for municipal purposes or public welfare.

2. Section 11-11-1 of the Illinois Municipal Code, 65 Ill. Comp. Stat 5/11-11-1, permits the City to exercise the right of eminent domain to acquire any improved or unimproved real property the acquisition of which is necessary or appropriate for the rehabilitation or redevelopment of any blighted or slum area. A "blighted or slum area" is defined as "any area where buildings or improvements, by reason of dilapidation, overcrowding, faulty arrangement or design, lack of ventilation, light or sanitation facilities, deleterious land uses, or any combination of these factors, are a detriment to public safety, health or morals, and an area of not less in the aggregate than 2 acres has been designated by ordinance or resolution as an integrated project for rehabilitation or redevelopment." 65 Ill. Comp. Stat 5/11-11-1.

3. Section 11-13-17 of the Illinois Municipal Code, 65 Ill. Comp. Stat. 5/11-13-17, permits the City to exercise the right of eminent domain to acquire all land which is necessary or appropriate for the rehabilitation or redevelopment of any area blighted by substandard buildings or structures.

4. Section 11-13-17 of the Illinois Municipal Code, 65 Ill. Comp. Stat. 5/11-13-17, permits the City to exercise the right of eminent domain to acquire buildings and structures which do not conform to the standards fixed by the corporate authorities pursuant to Section 11-13-1 of the Illinois Municipal Code.

5. Section 11-61-2 of the Illinois Municipal Code, 65 Ill. Comp. Stat. 5/11-61-2, permits the City to exercise the right of eminent domain to acquire property necessary for the establishment, opening, extension and improvement of public parks and other public grounds.

6. Section 11-94-1 of the Illinois Municipal Code, 65 Ill. Comp. Stat. 5/11-94-1, permits the City to exercise the right of eminent domain to acquire property necessary for the construction, improvement and operation of recreational facilities.

Pursuant to these sections of the Illinois Municipal Code, Joliet passed the eminent domain ordinance for ET I and ET II, Ordinance No. 15298, on October 4, 2005.

In Ordinance No. 15298, the Joliet city council determined through legislative action that ET was a blighted property. The 2007 Act provides that "[a]n acquisition of property primarily for the purpose of the elimination of blight is rebuttably presumed to be for a public purpose and primarily for the benefit, use, or enjoyment of the public under this subsection." 735 Ill. Comp. Stat. 30/5-5-5. Thus, Joliet's determination of blight at ET in 2005 is presumed to be correct. New West/New Bluff fails to rebut this presumption. The city council's determination that ET was blighted in 2005 is rational and supported by the record. So too is its exercise of the City's power of eminent domain to eradicate that blight.

Due to the large gap in time from the city council's original finding of blight in 2005 and the taking, however, the Court has previously ruled that the conditions of the property after 2005 are also to be considered for purposes of determining blight. In that respect, the Court agrees with the position taken by the Virginia Supreme Court in Norfolk Redevelopment & Housing Authority v. C&C Real Estate Inc., 630 S.E.2d 505 (Va. 2006). There, the court found that,

> while the original determination [of blight] retains the strong presumption of validity attached to such legislative acts, the current status of the property must be considered when determining whether the original purpose of the acquisition remains viable at the time the condemnation occurs. . . . Therefore, in this case, to rebut the presumption of validity, [the party opposing condemnation] bore the burden to show by clear and convincing evidence that the Property no longer was a blight or no longer exerted a blighting influence on the surrounding area.

Id. at 509-510. As applied here, New West/New Bluff had to show by clear and convincing evidence that ET is no longer a blighted property at the time of the taking (or, realistically, at the close of the evidence in this case). New West/New Bluff failed to make this showing. Weighing all of the evidence, the Court concludes that ET was and is blighted in accordance with the statutory factors set forth in 65 Ill. Comp. Stat. 5/11-11-1.

Furthermore, "[i]t is well settled that unless there is a clear abuse of discretion by the municipality, this court cannot interfere." Wheeling v. Exchange Nat'l Bank of Chi., 572 N.E.2d 966, 971 (Ill. App. Ct. 1991). The general rule in Illinois is that:

> where the legislature has delegated to a corporation the authority to exercise the power of eminent domain, the corporation has the authority to decide the necessity for exercising the right, and its decision will be conclusive in the absence of a clear abuse of the power granted. Absent a showing of an abuse of discretion, of which there is no indication here, the defendants must show that the ordinance is arbitrary, unreasonable or capricious. Again, the burden of going forward with the evidence was on the defendants . . . .

Id. at 971-972 (internal quotation marks and citations omitted). New West/New Bluff fail to prove that Joliet acted in bad faith or abused its discretion in finding the property blighted or in stating its intention to acquire the property for use as a public park. Therefore, the Court concludes that Joliet's Ordinance No. 15298 is valid.

### 4. The Doctrine of Equitable Estoppel

Nevertheless, New West/New Bluff contend that Joliet is barred by the doctrine of equitable estoppel from arguing that ET is blighted. However, "a finding of estoppel against a public body is not favored" and "[e]quitable estoppel should not be invoked against a public entity except under compelling circumstances, where to do so would not defeat the operation of public policy." Metro. Water Reclamation Dist. of Greater Chi. v. Civil Serv. Bd. of Metro. Water Reclamation Dist. of Greater Chi., 684 N.E.2d 786, 790 (Ill. App. Ct. 1997). To establish equitable estoppel, New West/New Bluff must show: (1) an affirmative act on the part of Joliet; and (2) that the affirmative act induced substantial reliance to New West/New Bluff's detriment. See id. New West/New Bluff argue that Joliet is equitably estopped from relying on its 2005 action or otherwise arguing that ET is blighted because, as contract administrator to ET II until 2007, the City annually certified to HUD that the units at ET II had been inspected and that the

45

payments made to New Bluff were in accordance with HUD's regulations and requirements. This evidence falls short of showing that New West/New Bluff substantially relied on Joliet's certifications to HUD. Indeed, any reliance on the yearly certifications is unreasonable in light of Joliet's communications to both HUD and New West/New Bluff of its concerns as to the numerous code violations at ET I and ET II, and ET II's failure to meet HUD's standards. Therefore, the Court rejects this argument.

### 5. The Doctrine of Prior Public Use

New West/New Bluff also argue that Joliet is prohibited from taking ET by the doctrine of prior public use. The "prior public use" doctrine dictates that a general grant of eminent domain power does not authorize the taking of property that is already devoted to a public use. Dep't of Pub. Works & Bldgs. v. Ells, 179 N.E.2d 679, 679 (Ill. 1962). New West/New Bluff argue that ET is already subject to a public use, that of providing affordable housing, and therefore it cannot be taken under the guise of a different public use. Although this doctrine has never been applied to private property in Illinois before, New West/New Bluff argue that it nonetheless applies, citing a 1965 case out of Maine, Oxford County Agricultural Society v. School Administrative District No. 17, 211 A.2d 893, 895 (Me. 1965). New West/New Bluff contend that privately owned property falls within this doctrine if the owner has devoted the property to a public use, which he is under a legal obligation to maintain. Id. The Court rejects the extension of this doctrine to private property. In any event, New West/New Bluff are not under a legal obligation to maintain ET as affordable housing. Private owners under contracts with HUD, like New West/New Bluff, "are entitled to withdraw their properties from the program at any time . . . . All they have to do is pay off the federally insured loan." City of

Joliet, 562 F.3d at 835. Accordingly, the Court finds and concludes that the doctrine of prior public use does not prohibit Joliet from taking ET by eminent domain.

## C. The Fair Housing Act Does Not Bar Joliet's Eminent Domain Action

Lastly, New West/New Bluff ask this Court to conclude that Joliet's stated public purposes to take ET—the eradication of blight and the extension of a public park—are mere pretexts for racial discrimination, and thus Joliet's taking would violate the FHA. This conclusion, however, is not supported by the evidence submitted at trial, and is therefore rejected.

The FHA makes it unlawful to "refuse to sell or rent…or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). In this case, New West/New Bluff claim that Joliet's eminent domain acquisition of ET would make housing in Joliet or in the area of Joliet around ET unavailable to African-Americans. A violation of the FHA can be proven against a city or other locality by demonstrating that a city policy or practice either has a discriminatory intent or, under some circumstances, a discriminatory effect, or disparate impact. City of Joliet, 562 F.3d at 837-838; Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights, 558 F.2d 1283, 1289-1290 (7th Cir. 1977) [hereinafter Arlington Heights II]; Snyder v. Barry Realty, Inc., 953 F. Supp. 217, 220 (N.D. Ill. 1996). Specifically, then, in order to prevail in their FHA defense, New West/New Bluff must demonstrate that Joliet either intentionally used its eminent domain powers to make housing in Joliet or the area in which ET is located unavailable to African-Americans or that the effect of Joliet's eminent domain acquisition of ET was to do so, without sufficient legitimate reason. City of Joliet, 562 F.3d at 837-838; Arlington Heights II, 558 F.2d at 1289-1290.

47

## 1. No Intentional Discrimination

Official action motivated by racially discriminatory intent or purpose violates the Equal Protection Clause and is unconstitutional. Washington v. Davis, 426 U.S. 229, 242 (1976). New West/New Bluff, however, are not required to prove that a discriminatory purpose was the sole motivation of Joliet's eminent domain action in order to prevail in a showing of discriminatory intent. Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265-266 (1977) [hereinafter Arlington Heights I]. "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Id. at 266.

New West/New Bluff bear the burden of establishing that Joliet intended to discriminate against the residents of ET because of race, and discriminatory intent may be proved by direct evidence or circumstantial evidence. Id.; Kormoczy v. Sec'y United States Dept. of Hous. & Urban Dev., 53 F.3d 821, 823-824 (7th Cir. 1995). New West/New Bluff do not purport to rely on direct evidence of disparate treatment, such as a facially discriminatory policy or an acknowledgment of discrimination. See, e.g., id. On its face, Joliet's eminent domain ordinance for ET does not discriminate against African-Americans or any group in general, but is based on legitimate public purposes for eminent domain. See Snyder, 953 F. Supp. at 220. The statements of intent in the ordinance itself and in the minutes created at the time of its unanimous approval by Joliet's city council focus entirely on non-discriminatory public purposes appropriate for an eminent domain action—the elimination of blight and the extension of a public park. There is no direct evidence of discriminatory intent.

Instead, New West/New Bluff purport to rely on circumstantial evidence to prove their claim of intentional discrimination. Circumstantial evidence of intentional discrimination

includes the historical background of the decision, the legislative history and contemporaneous statements by members of the decision-making body, whether legitimate reasons exist for the decision, and other statements by supporters or ambiguous statements by the City in enacting the Ordinance. See Arlington Heights I, 429 U.S. at 267-271; Daveri Dev. Group, LLC v. Vill. of Wheeling, 934 F. Supp. 2d 987, 996-1000 (N.D. Ill. 2013).

New West/New Bluff argue that the following constitute circumstantial evidence of intentional discrimination: (1) Joliet's lack of a public purpose for eminent domain; (2) the effect of eminent domain would be to make housing or subsidized housing in Joliet unavailable to African-Americans and perpetuate segregation; and (3) former Joliet city councilman Brophy allegedly referred to the residents of ET as "rats."

As to the first argument, the Court has already rejected New West/New Bluff's contention that Joliet lacks a valid public purpose.

Likewise, as discussed above, the Court finds that Joliet's exercise of eminent domain on ET would not have the effect of making housing unavailable to African-Americans or perpetuate segregation. No units of affordable housing will be lost should the City be successful in the taking of ET. A number of units will be maintained at the property or at another location and all other residents will be given portable vouchers for housing of their choice, in Joliet or elsewhere. Moreover, given the demographics of Joliet, and of the portion of Joliet in which ET is located in particular, New West/New Bluff's argument is senseless. As the demographic statistics show, Joliet is a very diverse city, not an enclave of predominantly white affluent residents. In 2010, Joliet was fifty-three percent non-Hispanic white, twenty-eight percent Hispanic, and sixteen percent African-American;[10] the census tract containing ET was seventeen percent non-Hispanic

---

[10] Like the statistics for white persons, the statistics given for African-American persons here excludes Hispanic persons who identify themselves in that category also. See HUD Ex. 466-468.

white (down from thirty-two percent in 2000), thirty-seven percent Hispanic, and forty-five percent African-American; and Joliet Township was forty-five percent non-Hispanic white, thirty-five percent Hispanic, and twenty-four percent African-American. Pursuant to the settlement with HUD, Joliet must maintain 115 subsidized housing units at the property. This leaves, at most, the relocation of 240 ET families to a location of their choice, including in Joliet. This few amount of people cannot be reasonably believed to affect the overall demographics of Joliet or of ET's surrounding area, which has a population of 147,433 as of 2010. Therefore, this circumstantial evidence relied on by New West/New Bluff cannot support the conclusion that Joliet possesses a discriminatory intent.

Lastly, New West/New Bluff rely on the alleged comments of former Joliet city councilman Brophy, who they claim referred to the residents of ET as "rats" or "rats from Chicago." As the Court stated above, even if the comments were made, the comments were spoken by a single city councilman at meetings with HUD—not within an official legislative setting and not representative of Joliet as a whole. The name-calling, if true, happened years before the eminent domain ordinance for ET was passed. Moreover, the overwhelming evidence shows that the City and its representatives were concerned with the crime, fire safety, unsanitary conditions, functional obsolescence and overall blight at the property. Put another way, the City was concerned about the health and safety of the residents of ET, not eliminating housing for African-Americans in the City. Additionally, Brophy is no longer on Joliet's city council, and there is no evidence that the current members have any discriminatory intent in their decision to continue this eminent domain action. "Rats" has proven to be nothing more than a red herring. There is simply no evidence that Joliet, through its legislative decision to take ET by eminent

domain, was in any way motivated by racial discrimination. The evidence here fails to support a conclusion of discriminatory intent in violation of the FHA.

### 2. *No Discriminatory Effect*

A party may be in violation of the FHA in some circumstances even in the absence of discriminatory intent, based on the discriminatory effect of the actions. Arlington Heights II, 558 F.2d at 1290. Longstanding case law provides, however, that a discriminatory effect under the FHA does not exist simply because there is some identifiable negative effect. Instead, the FHA's concern with discriminatory effect is to preclude municipalities from systematically depriving minorities of housing opportunities. Id. at 1289. Therefore, the Seventh Circuit has repeatedly held that only significant or substantial discriminatory effects that actually affect the availability of housing by a racial group can constitute a violation of the FHA. Id.; South-Suburban Hous. Ctr. v. Greater S. Suburban Bd. of Realtors, 935 F.2d 868, 888 (7th Cir. 1991); Vill. of Bellwood v. Dwivedi, 895 F.2d 1521, 1533 (7th Cir. 1990); Southend Neighborhood Improvement Ass'n v. Cnty. of St. Clair, 743 F.2d 1207, 1209-1210 (7th Cir. 1984); see also Hispanics United of DuPage Co. v. Vill. of Addison, 988 F. Supp. 1130, 1156 (N.D. Ill. 1997) (focusing on evidence of substantial disparate impact).

There are two kinds of discriminatory effect: (1) where the act complained of has "a greater adverse impact on one racial group than on another," and (2) when the act perpetuates segregation and prevents interracial association. Arlington Heights II 558 F.2d at 1291. New West/New Bluff contend that Joliet's pattern and practice of discrimination aimed at making housing within Joliet unavailable to African-Americans, through the instant condemnation action and its practice of demolishing nearly all the public housing in the city, results in both types of

discriminatory effect under Arlington Heights II. In an attempt to prove these allegations, New West/New Bluff proceed under a modified disparate impact theory.[11]

The Seventh Circuit has developed a four factor balancing test to determine whether FHA disparate impact claimants have established their prima facie case: (1) the strength of the showing of discriminatory effect; (2) the presence of some evidence of discriminatory intent, even if circumstantial and less than sufficient to satisfy Washington v. Davis, 426 U.S. 229 (1976); (3) the offending party's interest in taking the action complained of, and (4) whether the moving parties seek to compel the opposing party to affirmatively provide housing for members of minority groups or merely restrain the opposing party from interfering with individual property owners who wish to provide such housing. Arlington Heights II, 558 F.2d at 1290.

As to the first factor, New West/New Bluff fail to show a significant, negative effect from Joliet's use of eminent domain on ET. It is inevitable that any redevelopment or reduction in units at ET will disproportionately affect African-Americans—ET residents are over ninety percent African-American. But, Joliet's plan, as set forth in the settlement agreement with HUD, eliminates any substantial or negative effects. Any units removed in the redevelopment of the property will be replaced with a housing choice voucher that can be used in the same neighborhood, Joliet Township, or other areas of Joliet and the surrounding areas which have lower minority and low-income populations, if the voucher-holders so choose. Pursuant to the Joliet-HUD settlement, voucher-holders will be assured of finding housing in Joliet if they so desire. Nevertheless, New West/New Bluff argue that there would still be a discriminatory effect

---

[11] The Court notes that the United States Supreme Court has yet to decide the issue of whether disparate impact claims are even cognizable under the FHA. See Twp. of Mt. Holly, N.J. v. Mt. Holly Gardens Citizens in Action, Inc., No. 11-1507 (S. Ct. Nov. 13, 2013) (dismissing case on question of whether disparate impact claims are cognizable under the FHA prior to oral argument and decision due to settlement of the parties). Thus, this Court proceeds under the current law in this circuit which provides for disparate impact claims under the FHA. See Arlington Heights II, 558 F.2d at 1290.

or perpetuation of segregation if some residents who are given vouchers choose to leave the neighborhood or Joliet and go to areas that are even more concentrated with low-income or minority residents. However, providing the residents of ET with the ability to exercise increased choice over where they live, even if it is not to a statistically preferable location, is not the kind of effect that the FHA is intended to prevent. Accordingly, this factor does not weigh in favor of New West/New Bluff's disparate impact claim.

With respect to the second factor, the Court has already determined that New West/New Bluff fail to present any evidence of Joliet acting with a discriminatory intent. Similarly, the third factor also weighs against New West/New Bluff's claim because the Court found that Joliet . has two valid public purposes for which to take the property—the elimination of blight and use as a public park. With three out of the four balancing factors weighing heavily in favor of Joliet, the Court concludes that New West/New Bluff have failed to meet their burden of establishing a prima facie claim of disparate impact. Thus, the Court rejects New West/New Bluff's claim that Joliet's exercise of eminent domain will have a discriminatory effect in violation of the FHA.

## III. CONCLUSION

For the foregoing reasons, the Court rules in favor of Joliet on all of its claims, and against New West/New Bluff on all of their claims. The parties may now proceed to the takings phase of this eminent domain action.

IT IS SO ORDERED.

ENTER:

CHARLES RONALD NORGLE, Judge
United States District Court

DATE: September 17, 2014